STACHNIK v WINKEL

Docket No. 55418. Argued November 8, 1974 (Calendar No. 19).—
Decided June 24, 1975.

Andrew Stachnik, Clayton Stevens, and Violet Stevens brought
an action against Carl O. Winkel, Mary E. Winkel, Harry L.
Beach, and Marguerite C. Beach for specific performance of a
contract to sell land. The Leelanau Circuit Court, James M.
Fitzpatrick, J., found that the agreement relied on by the
plaintiffs was the result of an error of defendants Winkel
caused by representations made by the plaintiffs, and entered a
judgment for the defendants. The Court of Appeals, Danhof,
P. J., and McGregor and Miles, JJ., reversed the trial court and
granted specific performance for plaintiffs (Docket No. 14209).
Defendants appeal. *Held:*

1. The equitable doctrine of clean hands is a self-imposed
ordinance that closes the doors of a court of equity to one
tainted with inequitableness or bad faith relative to the matter
in which he seeks relief. It is designed to preserve the integrity
of the judiciary, and therefore courts may apply it on their own
motion even though it has not been raised by the parties or the
courts below.

2. The plaintiffs in this action represented themselves as
authorized to purchase the property in suit "for the company",
by which the sellers Winkel understood the plaintiffs' em-
ployer, codefendants Beach. They sought to mislead the Wink-
els, and whether the Winkels relied upon their misrepresenta-
tions, while an element of the defense of fraud, is not impor-
tant in determining whether they have clean hands. Plaintiff
Stevens also acted disloyally and without good faith toward his
employers in acquiring land he knew to be vital to his employ-
ers' lumbering operations. The plaintiffs do not come before the

REFERENCES FOR POINTS IN HEADNOTES
[1, 7–9, 13] 71 Am Jur 2d, Specific Performance §§ 47, 49, 50.
[2–4, 12] 27 Am Jur 2d, Equity § 136 *et seq.*
[5] 27 Am Jur 2d, Equity §§ 266, 267.
[6] 71 Am Jur 2d, Specific Performance § 49.
[10] 77 Am Jur 2d, Vendor and Purchaser §§ 733–742.
[11] 5 Am Jur 2d, Appeal and Error §§ 703, 822.

court with clean hands, and the Court denied specific performance.

J. W. Fitzgerald, J., with whom T. G. Kavanagh, C. J. concurred, dissented for the reasons that on the record presented, there was a meeting of the minds between plaintiffs and defendants Winkel, and that defendants failed to sustain their burden of proof in establishing their defense that plaintiffs did not have clean hands because they were disloyal employees of defendants Beach who availed themselves of a profit-making opportunity in breach of their understanding with their employer.

Reversed and the judgment of the trial court affirmed.

50 Mich App 316; 213 NW2d 434 (1973) reversed.

OPINION OF THE COURT

1. EQUITY—UNCLEAN HANDS—MISREPRESENTATION—GOOD FAITH.

Plaintiffs come before the Supreme Court with unclean hands and the Court declines to exercise its equitable jurisdiction in an action for specific performance where plaintiffs misrepresented to defendant seller that they were purchasing defendants' land for a lumber company when they intended to purchase the property for their own use and when one of the plaintiffs acted without good faith toward his employer, another defendant, in buying the land.

2. EQUITY—CLEAN HANDS.

One seeking the aid of equity must come with clean hands.

3. EQUITY—CLEAN HANDS—BAD FAITH.

The clean hands maxim is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant.

4. EQUITY—CLEAN HANDS—RAISING ISSUE.

Since the clean hands maxim is designed to preserve the integrity of the judiciary, courts may apply it on their own motion even though it has not been raised by the parties or the courts below.

5. APPEAL AND ERROR—EQUITY—FINDINGS—WITNESSES—CREDIBILITY.

While the Supreme Court reviews an equity proceeding *de novo* it gives considerable weight to the findings of the trial judge because he is in a better position to test the credibility of the

witnesses by observing them in court and hearing them testify than is an appellate court which has no such opportunity.

6. SPECIFIC PERFORMANCE—MISREPRESENTATION—CLEAN HANDS—DIS-CRETION.

All the elements of fraud must be present, including reliance upon the misrepresentation, before the *legal* defense of fraud will bar specific performance, but all elements need not be present for the court to exercise its discretion and invoke the clean hands maxim to bar specific performance.

7. SPECIFIC PERFORMANCE—EQUITY—CLEAN HANDS.

The clean hands doctrine is more than just another defense to be used by the party seeking to block specific performance: it is a doctrine to be invoked by the court in its discretion to protect the integrity of the court.

8. SPECIFIC PERFORMANCE—MISREPRESENTATION—EQUITY—CLEAN HANDS.

The conduct of plaintiffs, in their efforts to acquire property from an elderly couple, in intentionally misrepresenting themselves as agents of a timber company in order to enhance the chances for success leaves them with unclean hands; therefore, specific performance is denied.

9. EQUITY—CLEAN HANDS—GOOD FAITH.

Whether one of several plaintiffs was asked by his employer to procure for the employer the property of an elderly couple prior to or subsequent to the plaintiffs' entering into negotiations and agreement for themselves with the elderly couple is irrelevant because, for the purpose of invoking the clean hands maxim, it is enough that one of the plaintiffs in purchasing the property acted disloyally and without good faith toward his employer.

### DISSENTING OPINION

T. G. KAVANAGH, C. J., and J. W. FITZGERALD, J.

10. VENDOR AND PURCHASER—MEETING OF MINDS—EVIDENCE.

*Evidence of a meeting of the minds in a contract for sale of lands was overwhelming on a record which showed a written agreement naming plaintiffs as buyers in their own right and defendant landowners as sellers, and testimony of one of the landowners that she knew the land was being sold to plaintiffs and, when approached by her codefendants about a sale, "felt" that land had already been sold to plaintiffs, as against slight*

*evidence that the landowners were induced to sell by representations that plaintiffs were agents of the codefendants.*

11. APPEAL AND ERROR—EQUITY—DE NOVO REVIEW.

*The Court of Appeals and, upon further review, the Supreme Court exercise* de novo *review in an equity case.*

12. APPEAL AND ERROR—EQUITY—CLEAN HANDS.

*The fact that a clean hands issue was never argued or presented to the trial court will not bar the consideration of that issue upon appeal because the Supreme Court reviews equity proceedings* de novo.

13. SPECIFIC PERFORMANCE—CLEAN HANDS—CONTRACTS—LAND—BURDEN OF PROOF.

*Defendants who interjected a clean hands issue in an action for specific performance of a contract to sell land failed to sustain their burden of proof in establishing that plaintiffs were disloyal employees of codefendants of the landowners who availed themselves of a profit-making opportunity in breach of their understanding with their employer where plaintiffs persistently denied that they acted as agents of the codefendants in making the contract, the writing indicated that plaintiffs were buying in their own right, one of the landowners testified that because plaintiffs said they were working for a big lumber company she took it for granted that they were purchasing for the codefendants but also that when the codefendants approached her about a sale of the land she felt she already had an agreement with the plaintiffs, and one of the codefendants first testified that he had asked plaintiffs to talk to the landowners about a sale after the date plaintiffs and landowners had made a written agreement, which was corroborated by other testimony, and later changed his account to make it before the date of the writing.*

*Zerafa, Zerafa & Tremp, P. C.,* for plaintiffs.

*Hubbell, Blakeslee, McCormick & Houlihan,* for defendants Beach.

WILLIAMS, J. Plaintiffs ask this Court to require defendant Mary E. Winkel[1] to convey property. Plaintiffs worked for defendants Beach cutting

---

[1] Carl O. Winkel, husband of Mary Winkel, named in the original complaint, is now deceased.

lumber on property adjacent to defendant Winkel's property, which was the only access to the lumbering operation. Finding plaintiffs Andrew Stachnik and Clayton Stevens misrepresented to defendant Winkel that they were purchasing for "the lumber company" and that plaintiff Clayton Stevens acted without good faith toward his employer defendant Beach in buying defendant Winkel's land which defendant Beach wanted to buy, we hold plaintiffs come before us with unclean hands and decline to exercise our equitable powers. Having denied plaintiffs relief for lack of clean hands, it is unnecessary for us to decide whether the trial court was correct in holding that no contract existed at law between the plaintiffs and the Winkels.

I. FACTS.

In October, 1967 plaintiffs, Clayton Stevens and Andrew Stachnik, entered into a contract with defendants, Harry and Marguerite Beach, who operated a lumber company, to cut timber on an 80-acre parcel of land in Leelanau County owned by the Beaches. The only available access for removing the cut timber from the defendant Beaches' property was across an adjacent parcel of land owned by defendants Carl and Mary Winkel, an elderly couple residing in the Flint area.

In November, 1967, in the presence of plaintiff Stevens defendant Beaches' attorney attached a note to a trailer located on the Winkel property indicating that the Beaches were interested in acquiring the parcel of land.

When the defendant Winkels visited their property some time in April, 1967, they were disturbed to find it being used, without their consent, as an access route for the lumbering operations on the adjacent defendant Beaches property. They ex-

pressed their concern to plaintiff Stachnik who indicated that he worked for the lumber company and that he would inform his boss of the Winkels' concern. It was agreed that Stachnik's boss would contact the Winkels at their home.

A week or two later, Stevens called the Winkels and asked if they wished to sell the property. As a result of this phone conversation a meeting was held on May 15, 1968, between the three plaintiffs and the Winkels. A price of $3500 for the 23-acre parcel and the mobile home on the land was set. On May 16, 1968 the Winkels and Clayton Stevens signed the following agreement:

"May 16, 1968

"Mr. Carl O. Winkel and
Mrs. Mary E. Winkel,
1205 West Stanley Road
Mt. Morris, Mich. 48458

"It is agreed that Andrew Stachnik and Clayton and Violet Stevens shall purchase by land contract your property located in Glen Arbor Twp. Leelanau Co situated on Wheeler Road.

"The conditions of purchase are, $3500.00 with a deposit of $200.00 toward said purchase the balance to be paid at the rate of $100.00 per month with interest 6% on the unpaid balance. Payments to commence on July 1, 1968. A 2 week grace period on said payments. The accompany *[sic]* check to be cashed upon the submittal of the land contract properly signed and executed.

"Clayton Stevens, et al.
Carl O. Winkel
Mary E. Winkel"

Mrs. Winkel gave unchallenged testimony that during the discussions leading up to the sale of the property, Stachnik and Stevens represented to her

that they had been authorized to buy the property
"for the company".

After concluding the agreement with the Wink-
els the plaintiffs took possession. Defendant Beach,
upon discovering that plaintiffs were occupying the
23-acre parcel, entered into discussions with the
Winkels and their attorney concerning the sale of
the property. On June 4, 1968 the Winkels exe-
cuted and delivered a warranty deed to the
Beaches for the 23-acre parcel.

Plaintiffs vacated the property but filed a com-
plaint in Leelanau Circuit Court seeking to have
the conveyance from the Winkels to the Beaches
set aside, and to require the Winkels to specifically
perform their agreement with the plaintiffs.

Harry Beach testified during the trial that not
only did Stevens know that the Beaches were
interested in acquiring the Winkel property but
that he had asked Stevens to purchase the Wink-
els' parcel of land prior to the time Stevens and
the other plaintiffs obtained the land for them-
selves. At trial, Stevens denied ever talking to
Beach about acquiring the property before he and
the others entered into negotiations with the
Winkels and purchased their property.

The circuit court, finding that Stevens and Sta-
chnik had represented to the Winkels that they
were authorized to make the purchase for the
timber company, concluded that "an error was
made in having the agreement indicate a sale of
the property to the plaintiffs herein rather than to
[the Beaches' company]". The court also found the
agreement with the plaintiffs was not valid for
lack of consideration.

The Court of Appeals in reversing the circuit
court on October 31, 1973, ruled that there was a
sufficient meeting of the minds and that the agree-

ment did not lack adequate consideration. The Court also held that since neither the parties nor the circuit judge raised the issue of clean hands, it would be inappropriate to consider the question on appeal. 50 Mich App 316. We granted leave on March 29, 1974. 391 Mich 796.

## II. COURT MAY *Sua Sponte* RAISE CLEAN HANDS MAXIM.

"No citation of authority is necessary to establish that one who seeks the aid of equity must come in with clean hands." *Charles E. Austin, Inc v Secretary of State,* 321 Mich 426, 435; 32 NW2d 694 (1948). The clean hands maxim is an integral part of any action in equity. The United States Supreme Court captured the essence of the maxim when it said:

"[The clean hands maxim] is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant. That doctrine is rooted in the historical concept of the court of equity as a vehicle for affirmatively enforcing the requirements of conscience and good faith. This presupposes a refusal on its part to be 'the abettor of iniquity.' *Bein v Heath,* 6 How [47 US] 228, 247 [12 L Ed 416 (1848)]." *Precision Instrument Manufacturing Co v Automotive Maintenance Machinery Co,* 324 US 806, 814; 65 S Ct 993; 89 L Ed 1381 (1944).

Since the clean hands maxim is designed to preserve the integrity of the judiciary, courts may apply it on their own motion even though it has not been raised by the parties or the courts below. See *Gaudiosi v Mellon,* 269 F2d 873, 881–882 (CA3, 1959). See also *Hall v Wright,* 240 F2d 787, 795

(CA9, 1957); *Frank Adam Electric Co v Westing-house Electric & Mfg Co,* 146 F2d 165, 167 (CA8, 1945).

This Court reviews equity actions *de novo.* To suggest, as the Court of Appeals below has done, that we may not consider whether the plaintiffs come before us with clean hands simply because neither the parties nor the judge in the circuit court raised the issue below would be contrary to the very rationale behind the creation of the clean hands maxim.

### III. PLAINTIFFS' MISREPRESENTATION TO THE WINKELS.

In their efforts to acquire the Winkel property, the plaintiffs Stachnik and Stevens represented themselves as authorized to purchase the property "for the company". Since they intended to purchase the property for their own use, they misrepresented the facts to the Winkels and consequently cannot be said to come before us with clean hands.

The Court of Appeals concluded that Mrs. Winkel only "thought" that the plaintiffs were acting as agents for the company and that they in fact had never made any such representations. However, the trial court found as a matter of fact that the plaintiffs *had* represented themselves as authorized to act for the timber company.

While we, as did the Court of Appeals, review this proceeding *de novo,* we give "considerable weight" to the findings of the trial judge because he

"is in a better position to test the credibility of the witnesses by observing them in court and hearing them testify than is an appellate court which has no such opportunity." *Christine Building Co v City of Troy,* 367

Mich 508, 518; 116 NW2d 816 (1962). See *Kropf v Sterling Heights,* 391 Mich 139; 215 NW2d 179 (1974).[2]


The record supports the trial judge's conclusion that Stachnik and Stevens represented themselves as agents for the company. This fact is evident from the following excerpts from testimony given by Mrs. Winkel which was uncontested by the plaintiffs:

"*Q.* And what was discussed then, Mrs. Winkel?

"*A.* Well, the sale of property.

"*Q.* And who did you understand the purchaser to be?

"*A.* Well, I didn't understand when they [Stevens and Stachnik] talked about it. *Before they talked like they were buying it for the company they worked for.*

"*Q.* Who told you that?

"*A.* They both said that.

"*Q.* When?

"*A.* Well, when they came up to do this.

"*Q.* On the 15th?

---

[2] GCR 1963, 517.1 provides in pertinent part:

".1 Effect. * * * Findings of fact shall not be set aside unless clearly erroneous. In the application of this principle regard shall be given to the special opportunity of the trial court to judge the credibility of those witnesses who appeared before it." In *Papin v Demski,* 383 Mich 561, 568; 177 NW2d 166 (1970), we said:

"Has the scope of review in chancery cases been limited by the rule? [GCR 1963, 517.1] Stated another way—should an appellate court in chancery cases follow Rule 517.1 relating to findings of fact and conclusions of law by the trial court or is it free to disregard the findings and decision of the trial judge and proceed *de novo* as if the case had never been heard and decided by a lower court? We do not regard the above rule as being in conflict with or as having altered an appellate court's *de novo* power in a chancery case as formerly known and exercised.

"The rule requires that 'regard shall be given to the special opportunity of the trial court to judge the credibility of those witnesses who appeared before it.' It is repeatedly stated in our opinions that recognition is given in a chancery case to this special ability of the trial judge. See, for example, *Christine Building Company v City of Troy* (1962), 367 Mich 508, and *Biske v City of Troy* (1969), 381 Mich 611, 613."

"*A.* Yeah, I am not sure what he said to my husband over the phone.

"*Q.* I see. What did he [Stevens] tell you on the 15th exactly?

"*A.* That he had—*I don't know if you would say, 'permission,' but he was supposed to buy the property if we wanted to sell.*

"*Q.* Well, who did you understand the purchaser of the property to be?

"*A. Well, we thought he was buying it for the company he worked for.*

"*Q.* What company was that?

"*A.* Well, Mr. Stachnik told me sometime something about a company called, 'Timberwolves, Incorporated.' That's the only name I ever heard.

"*Q.* Well, when you signed this instrument, who was the purchaser on this instrument?

"*A.* Mr. Stevens, *but we thought he had permission to buy it.*"[3] (Emphasis added.)

Mrs. Winkel clearly "thought" the plaintiffs were acting for the timber company, but she did not reach this mistaken conclusion on her own. The plaintiffs "assisted" her in reaching this conclusion.

Plaintiffs argue that even if misrepresentations were made, the doctrine of clean hands should not be applied by this Court because defendants failed to establish that the Winkels relied upon those representations in reaching their decision to sell the property.[4]

---

[3] Our colleagues make much of the fact that Mrs. Winkel knew she was selling the property to the plaintiffs and that the plaintiffs' names appeared in the contract. Of course Mrs. Winkel "knew" she was selling the land to the plaintiffs, but she testified that she had been led to believe that they were buying the parcel for and with the permission of the "timber company".

[4] The Court of Appeals apparently shared the plaintiffs' view. In discussing the clean hands maxim with regard to the plaintiffs' representation the Court said only that:

"According to defendant Mary Winkel, *it was not the capacity of the plaintiffs that induced a sale.* She testified:

While all the elements of fraud must be present, including reliance upon the misrepresentation, before the *legal* defense of fraud will bar specific performance,[5] all elements need not be present before this Court may exercise its discretion and invoke the clean hands maxim to bar specific performance.

The clean hands doctrine is more than just another defense to be used by the party seeking to block specific performance. It is a doctrine to be *invoked by* the Court in its discretion to protect the *integrity of* the Court.

To invoke the clean hands maxim

"one's misconduct need not necessarily have been of such a nature as to be punishable as a crime or as to justify legal proceedings of any character. Any willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause for the invocation of the maxim by the chancellor." *Precision Instrument Manufacturing Co v Automotive Maintenance Machinery Co, supra,* 815.

In *Rust v Conrad,* 47 Mich 449, 454; 11 NW 265 (1882), Justice COOLEY concluded:

"[W]hen a party comes into equity it should be very plain that his claim is an equitable one. If the contract is unequal; if he has bought land at a price which is wholly inadequate; if he has obtained the assent of the

---

" '[H]e asked us if we wanted to sell. Well, with a lumber mill next door, it wasn't quiet and peaceful anymore, so my husband really sort of lost interest in the whole thing.' " (Emphasis added.)

While the Winkel's displeasure with having a lumber mill next door may have been a factor in their decision to sell the property, this fact in no way precludes a finding their decision to sell *to the plaintiffs* was in part based upon the Winkel's belief that the plaintiffs were representing the lumber company.

[5] *See Reinink v Van Loozenoord,* 370 Mich 121, 123; 121 NW2d 689 (1963).

other party to unreasonable provisions; if there are *any
indications of* overreaching or *unfairness* on his part,
the court will refuse to entertain his case, and turn him
over to the usual remedies." (Emphasis added.) See also
*Gee v Gee,* 254 Mich 415; 236 NW 820 (1931).

In determining whether the plaintiffs come be-
fore this Court with clean hands, the primary
factor to be considered is whether the plaintiffs
sought to mislead or deceive the other party, not
whether that party relied upon plaintiffs' misrep-
resentations.[6]

In this case, Stevens and Stachnik, in their
efforts to acquire property from an elderly couple,
intentionally misrepresented themselves as agents
of the timber company in order to enhance the
chances for success. This conduct leaves them with
unclean hands.

IV. VIOLATION OF RELATIONSHIP WITH EMPLOYER.

We need not decide whether plaintiff Stevens
was asked by Harry Beach to procure the Winkels'
property prior or subsequent to the plaintiffs en-
tering into negotiations and agreement with the
Winkels. For the purpose of invoking the clean
hands maxim it is enough that Stevens in purchas-
ing the property acted disloyally and without good
faith towards his employer, the Beaches. Stevens

---

[6] 30 CJS, Equity, § 95, p 1025. *See also Bishop v Bishop,* 257 F2d
495 (CA3, 1958); *Weiner v Romley,* 94 Ariz 40; 381 P2d 581 (1963).

This is not to suggest that a court may not consider the fact that no
injury resulted from the plaintiff's actions. *See Price v Nellist,* 316
Mich 418; 25 NW2d 512 (1947); *White Star Refining Co v Holly
Lumber & Supply Co,* 271 Mich 662; 261 NW 72 (1935).

Rather it must be remembered that a court in exercising its
discretion to invoke the clean hands maxim is "not bound by formula
or restrained by any limitation that tends to trammel the free and
just exercise of discretion." *Keystone Driller Co v General Excavator
Co,* 290 US 240, 245–246; 54 S Ct 146; 78 L Ed 293 (1933).

was under contract to the Beaches and was in charge of the lumber operations during the entire time he sought and acquired the Winkels' land. He was aware of the fact that access through the Winkels' property was vital to the lumbering operation and he admitted being present when the Beaches' attorney left a note on the Winkels' trailer expressing an interest in acquiring the parcel of land.

Stevens, a man in charge of the lumbering operations, aware of the importance of the property to that operation and knowing that his employers were interested in obtaining the property, entered into negotations and acquired for himself and his associates this land so vital to his employers' timber operations. He cannot be said to be before this Court with clean hands. Whether the facts of this case would constitute a breach of some legal duty is not before us.

## V. Conclusion.

Plaintiffs' request that defendant Mary Winkel be required to specifically perform her part of the May 16, 1968 agreement is denied. We find that plaintiffs do not come before us with clean hands because in purchasing the land in question, plaintiffs Stachnik and Stevens misrepresented certain facts to the Winkels and plaintiff Stevens acted disloyally and without good faith towards his employers.

The Court of Appeals is reversed. The trial court is affirmed for the reasons stated above.

Costs to defendants.

Levin and M. S. Coleman, J. J., concurred with Williams, J.

J. W. FITZGERALD, J. *(dissenting).* Plaintiffs Andrew Stachnik, Clayton Stevens and Violet Stevens brought this action for specific performance of a contract to sell land. Evidence submitted before the trial court indicated that defendants Carl O. Winkel, now deceased, and Mary Winkel did arrive at something in the nature of an agreement on May 15, 1968. The substance of the "agreement" was put in writing on the next day, May 16, and indicated as follows:

"It is agreed that Andrew Stachnik and Clayton and Violet Stevens shall. purchase by land contract your property located in Glen Arbor Twp. Leelanau Co. situated on Wheeler Road.

"The conditions of purchase are, $3500.00 with a deposit of $200.00 toward said purchase the balance to be paid at the rate of $100.00 per month with interest of 6% on the unpaid balance. Payments to commence on July 1, 1968. A 2 week grace period on said payments. The accompany *[sic]* check to be cashed upon the submittal of the land contract properly signed and executed.

> "Clayton Stevens, et al
> Carl O. Winkel
> Mary E. Winkel"[1]

Defendants Beach approached the Winkels on the second or third of June, 1968 along with their attorney. They were advised by the Winkels that the property had already been sold to plaintiffs. Defendants and their attorney then met with the Winkels in Flint, Michigan and convinced the Winkels that their agreement with plaintiffs was of no force. Thereupon, the Winkels executed and delivered a warranty deed to the same property to defendants Beach on June 4, 1968.

---

[1] Plaintiff Stevens tendered a check for $200 to the Winkels at the time the agreement was signed.

A non-jury trial was held and judgment for the defendants was entered. For purposes of the present appeal[2] the significant finding of the trial court may be paraphrased as follows:

In view of representations by plaintiffs Stachnik and Stevens that their efforts toward purchase of the land were made on behalf of the "Company", an *error* was made in having the May 16 agreement indicate sale of the property to plaintiffs rather than defendants Beach.

The Court of Appeals, in its opinion on appeal, noted that the record below is reviewed *de novo* when equitable proceedings (here an action for specific performance) are involved. That Court reversed the trial court and granted plaintiffs specific performance. For purposes of the present appeal the significant findings of the Court of Appeals[3] are the following:

(1) In view of the fact that Mrs. Winkel (Mr. Winkel at the time of trial was deceased) acknowledged reading the May 16 agreement and indicated to defendants when they approached her that the land had already been sold to plaintiffs, there was a sufficient meeting of the minds respecting the May 16, 1968 contract of sale;
(2) The doctrine of "clean hands" would not bar plaintiffs' right to specific performance because:
    (a) defendants Beach are in no position to assert the doctrine, having themselves unilaterally persuaded the Winkels that their original agreement was defective, thereby subjecting them to lawsuit;
    (b) the clean hands issue was not raised by defendants Beach at the trial and therefore may not be raised for the first time on appeal; and

---

[2] Defendants abandoned on this appeal certain issues which were raised and treated in both the trial court and the Court of Appeals. The holdings and findings of the courts below are set forth only as they are pertinent to the issues before this Court.

[3] See footnote 2, *supra.*

(c) in any event, the assertion that plaintiffs did not have clean hands because they breached an agency relationship with defendants Beach in purchasing the property in their own right is unconvincing because the testimony of Mrs. Winkel indicates that it was not the asserted agency capacity of plaintiffs which induced the sale.

We granted leave to appeal. On appeal defendants Beach first contend that the Court of Appeals erred in concluding that there was a meeting of the minds respecting the May 16, 1968 agreement in disregard of a trial court finding to the contrary. Defendants' other contentions concern the applicability of the clean hands doctrine and its effect upon plaintiffs' right to specific performance.

## I. MEETING OF THE MINDS[4]

Defendants Beach pertinently direct us to authority indicating that it is with great reluctance that an appellate court will reverse findings of fact of the chancellor. Thus in *Vargo v Ihlenfeldt*, 359 Mich 265, 266; 102 NW2d 550 (1960), the Court stated, when faced with plaintiffs' argument that the chancellor incorrectly determined the facts:

"Plaintiffs, pained at the result below, would have us disagree with proof-supported and decisive findings of fact recorded by the trial chancellor; findings which, as our decisions boresomely disclose, are within the comparatively better province of one who sees and hears the controlling evidence as it comes from the lips and personal demeanor of disinterested as well as interested witnesses. It is an established truism that an appellate

---

[4] The trial court opinion indicated that that court "did not pass" upon the meeting of the minds issue. The Court of Appeals did pass upon that issue, finding that there was a meeting of the minds. We view the trial court resolution as set forth above tantamount to a conclusion that there was no meeting of the minds.

court is not as well equipped to do justice—the case being one of pure fact dispute—as is the chancellor-trier of fact whose immediate task is that of personal appraisal of proof and witness."

The Court of Appeals correctly observed that in this equity case that Court (and, for that matter, this Court, upon further review) exercises *de novo* review. That Court went on, however, to observe that it would not disturb the findings of the trial court unless convinced that it would have reached a different result had it been in the lower court's position. This Court has similarly commented respecting the appellate perspective upon exercise of *de novo* review. See, *e.g., Padover v Farmington Twp,* 374 Mich 622, 632; 132 NW2d 687 (1965), quoting from *Christine Building Co v City of Troy,* 367 Mich 508; 116 NW2d 816 (1962). These observations are consistent with the quoted statement from *Vargo, supra.* We approach *de novo* review, as by its own admission did the Court of Appeals, cognizant of the limitations of our appellate perspective.

It was the claim of defendants Beach at trial that plaintiffs Stachnik and Stevens were agents commissioned by the Beaches to inquire into and arrange the purchase of the Winkel property for the Beaches. At the time plaintiffs were employed by defendants Beach to remove timber from land of the Beaches adjoining the Winkel land. There was record testimony indicating that ownership of the Winkel land was significant to the Beaches because the Winkel land provided access to the Beach property.

Plaintiffs consistently denied that there was any agency relationship with the Beaches established prior to the signing of the May 16 agreement. Review of the evidence indicating the understand-

ing of the Winkels is essential to resolution of the meeting of minds issue.

Mary Winkel testified that she "took it for granted" that because plaintiffs had said they worked for a big lumber company (referring, apparently, to the Beaches' enterprise) that plaintiffs were purchasing for the "Company". On the other hand, the agreement which the Winkels signed indicated that plaintiffs were purchasing in their own right. The following testimony of Mrs. Winkel appears on the record:

"*Q.* And in your discussions on the evening of the 15th of May in the housetrailer on the property, who did you understand you were going to sell the property to?

"*A.* Well, I knew we were selling it to him.

"*Q.* To Mr. Stevens?

"*A* Yes.

"*Q.* And you knew that, also, on the 16th when you signed it, didn't you?

"*A.* Yes.

"*Q.* Now, on the 16th did you see Mr. Stevens write a check and deliver it to either yourself or your husband?

"*A.* Yes.

"*Q.* Would this be the check, being Exhibit Two, this is the check you received?

"*A.* Yes.

"*Q.* Did you know that Mr. Stachnik was one of the purchasers of the property?

"*A.* Yes."

Mary Winkel also testified that she understood plaintiffs would be moving onto the property after the sale and the record reflects that plaintiffs did in fact occupy the house trailer which sat upon the property immediately after the sale. Even more conclusive is Mary Winkel's testimony that she

"felt", prior to the time of the Winkels' meeting with defendants Beach and their attorney, that she and her husband had sold the property to plaintiffs and that she told defendant Harry Beach when first contacted by him after the signing on May 16 that "there was an agreement already".

The evidence of a meeting of the minds on this record is overwhelming. By contrast, there is slight record evidence indicating that the Winkels were induced to sell because of plaintiffs' representations that they were agents for others. Given this record the Court of Appeals correctly found that there was mutual agreement respecting the May 16 writing.


## II. Clean Hands

The difficulty with this issue is that it was never argued or presented to the trial court. We therefore have no findings to review. Since we do review in equity proceedings *de novo,* however, we will not bar consideration of this issue upon appeal. Such consideration as we give must necessarily be limited by our appellate perspective.

Plaintiffs persistently denied the existence of any agency relationship with defendants Beach respecting their role in the purchase of the Winkel property. The testimony of Mary Winkel, as attested by the discussion of the foregoing issue, likewise lends but slight support to defendants' claim that plaintiffs did not have "clean hands". Defendant Harry Beach was the only other witness. In testifying he first indicated that he contacted plaintiffs asking them "to go up and try to talk to [the Winkels] and see if the property was for sale" in the *last* part of May, 1968. Harry Beach subsequently changed his account to indi-

cate plaintiffs were contacted in the first part of May. The former account corresponds with the testimony of plaintiff Stevens that Harry Beach only contacted him after the May 16 agreement was signed. Reviewing the cold record, we must conclude that defendants have failed to sustain their burden of proof in establishing that plaintiffs were disloyal employees who availed themselves of a profit-making opportunity in breach of their understanding with their employer.[5]

Affirmed. Costs to appellees.

T. G. KAVANAGH, C. J., concurred with J. W. FITZGERALD, J.

SWAINSON and LINDEMER, JJ., took no part in the decision of this case.

---

[5] In our review of this issue we are limited because we cannot view the demeanor and assess the credibility of the respective witnesses. Suffice it to say that this record presents no compelling evidence of a lack of clean hands on the part of plaintiffs.