# In the

# United States Court of Appeals

## For the Seventh Circuit

_____

Nos. 04-1525 & 04-1526

BAKER O'NEAL HOLDINGS, INC., and
AMERICAN PUBLIC AUTOMOTIVE GROUP, INC.,

*Plaintiffs-Appellees*,

v.

DONALD E. MASSEY,

*Defendant-Appellant*.

_____

Appeals from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
Nos. 1:02-cv-1628-DFH and 1:03-cv-0412-DFH—**David F. Hamilton**,
*Judge*.

_____

ARGUED NOVEMBER 3, 2004—DECIDED APRIL 5, 2005

_____

Before FLAUM, *Chief Judge*, and EASTERBROOK and
SYKES, *Circuit Judges*.

EASTERBROOK, *Circuit Judge*. Baker O'Neal Holdings and
its subsidiary American Public Automotive Group (col-
lectively APAG) were formed to operate "auto malls" in which
dealers selling many different brands of automobiles would
congregate. These would be established near suburban shop-
ping malls, so that customers could buy everything from
kitchen blenders to SUVs in one stop. The business did not
succeed, and a bankruptcy proceeding has been under way

since 1998. One adversary proceeding against James O'Neal, the subsidiary's CEO, ended in a judgment for more than $5 million after the bankruptcy judge concluded that he had embezzled funds from the venture. APAG has commenced another adversary proceeding against its former auditor, accusing it of booking "loans" to O'Neal as assets despite knowing that they were uncollectible. See *Ernst & Young LLP v. Baker O'Neal Holdings, Inc.*, 304 F.3d 753 (7th Cir. 2002) (rejecting auditor's contention that the dispute must be arbitrated). That claim remains to be resolved.

A third adversary proceeding, against Donald Massey, has produced a judgment for $2.5 million plus interest. APAG paid that sum as a deposit toward the $300 million purchase price of "the Don Massey Dealership Group." When APAG could not come up with the remaining $297.5 million, Massey kept the deposit. APAG did sell about $4.5 million in securities to outsiders on the spurious representation that the Massey dealerships were in hand, but O'Neal appears to have made off with those funds. The rest of APAG's financing came from Baker and outside investors who purchased their interests before the transaction with Massey.

The bankruptcy judge held, and the district judge agreed, that the $2.5 million is recoverable not only as a fraudulent conveyance but also to avoid unjust enrichment. See 2004 U.S. Dist. Lexis 2003 (S.D. Ind. Jan. 28, 2004). Massey, who unlike O'Neal has the money to satisfy the judgment, has appealed. Because the bankruptcy judge held a trial on unjust enrichment but not on the fraudulent-conveyance theory, and because either conclusion supports the judgment, we bypass the fraudulent-conveyance issues. That enables us to avoid the difficult question whether the record presents a disputed issue of material fact about APAG's solvency at the time it plunked down the $2.5 million. See 11 U.S.C. §§ 544, 550; Mich. Comp. Laws §566.35. It was insolvent if, as the bankruptcy judge held, the investments sold to outsiders are debt securities, but not if they are equity. They have

the form of convertible notes, but Massey contends with some support in the report of an accounting expert that they should be treated as equity because conversion was the only way for investors to obtain a return. We need not decide whether a dispute about the characterization of investments may be resolved on summary judgment if, as the bankruptcy judge concluded, Massey would be unjustly enriched by keeping the money. That ground for restitution applies whether or not APAG was solvent when the transfer occurred.

Non-refundable deposits are common when purchasing auto dealerships and other assets, such as real estate. APAG does not argue that deposits must be revocable because a non-refund feature turns them into "penalties" for breach of contract. See *Woodbridge Place Apartments v. Washington Square Capital, Inc.*, 965 F.2d 1429 (7th Cir. 1992). Instead it contends that the parties never concluded an agreement, and that retaining a payment made in anticipation of a contract is inequitable after the bargaining falls through. That is a correct statement of Michigan law, which the parties agree governs. See *Michigan Educational Employees Mutual Insurance Co. v. Morris*, 460 Mich. 180, 197-99, 596 N.W.2d 142, 151-52 (1999). Massey might have responded that a contract of sale is unnecessary if the payment is a fee for the right to negotiate. An option for exclusive bargaining rights is a kind of contract. Keeping an offer open, and other bidders away, is a valuable asset for which potential purchasers may agree to pay handsomely. But Massey does not contend that the payment is best characterized as an option premium. Instead, he disputes the bankruptcy judge's conclusion that the parties lacked a contract of sale. To evaluate that argument, we start with the text of the handwritten document that Massey and O'Neal signed on May 24, 1997:

### AGREEMENT

This is an Agreement to Purchase stock and assets of the Don Massey Dealership Group. The Seller is Don Massey and the Buyer is James O'Neal, Jr. and American Public Automotive Group, Inc. Seller and Buyer acknowledge their knowledge of the property and stock related to the Agreement. (Final Agreement to follow this Agreement.)

Buyers agrees to purchase all the stock and all assets of the Massey Group for the price of $300,000,000 00/100. New car inventory for cost in addition to the purchase price of all other assets.

> 1. The purchase price shall be payable as follows:
>
> > A.) Deposit with this Agreement $5,000,000 28 May 97.
> >
> > B.) Additional cash of $245,000,000 on 31 July 1997.
> >
> > C.) Seller to have option of $50,000,000 in cash or "Selling Book" 50,000,000 on IPO.
>
> 2. Massey will continue as Dealer Operator until he decides not to do so (at such time a replacement acceptable to Massey, O'Neal and GM will be named). Technical succession arrangements subject to final document.
>
> 3. Massey will provide Buyer with a copy of required 94, 95, 96 financials on 28 May 97.
>
> 4. Massey may cancel this Agreement and retain deposit if Buyer fails to perform as required in paragraph (1) "the money" or if GM does not grant approval of this transaction, funds will be returned.
>
> 5. Massey may elect to be paid in stock of the Buyer at market value.

On May 28, when the agreement called for APAG to pay $5 million and Massey to supply the financial statements, APAG handed over only $2.5 million, and Massey did nothing other than accept the money. The contemplated "Final Agreement" was never negotiated, and no stock or assets changed hands.

Like the bankruptcy judge and the district judge, we conclude that this document—which acknowledges that a definitive agreement remained to be negotiated—is too sketchy. Take the most basic questions: what did Massey agree to sell, and how much did APAG agree to pay? Documents omitting such vital information are not enforceable as contracts under Michigan law. See, e.g., *Hansen v. Catsman*, 371 Mich. 79, 123 N.W.2d 265 (1963); *Heritage Broadcasting Co. v. Wilson Communications, Inc.*, 170 Mich. App. 812, 818-20, 428 N.W.2d 784, 787 (1988).

This document says that "the Don Massey Dealership Group" is the thing being sold, but there never has been any such entity. Massey is the sole stockholder of some corporations that operate dealerships, and he is a joint investor with Arnold Palmer and Mark McCormack in two other dealership-owning corporations. Massey also owned, and leased to the corporations, considerable real estate (including buildings and fixtures). Which of these interests was included in the transaction? The answer cannot be found in usages of trade or other means that courts sometimes use to complete contracts; this was a one-off bargain. See *Redding v. Snyder*, 352 Mich. 241, 246, 89 N.W.2d 471, 474 (1958).

Massey's accounting expert, when valuing the transaction for purposes of the fraudulent-conveyance claim, assumed that Massey was selling everything he owned in the auto business. But Massey himself has taken a different view. In several affidavits Massey asserted that the agreement covered only his Cadillac dealerships, and then only those that he owned outright. His Buick, Pontiac, Chevrolet,

Saturn, and Geo dealerships were outside the deal, Massey asserted. When it became clear that this would demonstrate that the price was impossibly high, creating insuperable problems for Massey on the fraudulent-conveyance branch of the case, he changed his tune and contended that the agreement covered all dealerships *except* those owned jointly with Palmer and McCormack. Massey never articulated the third possibility—that he was selling all of his interests in the auto business. What is more, Massey has contended throughout that he sold only the dealerships (the franchises, accounts, trademarks, good will, and so on) while retaining the buildings and real estate. APAG, for its part, thought that it was getting the whole business: all the franchises, all the buildings, all the land, all the receivables. There was no agreement, no "meeting of the minds" (let alone of the words), on this subject. The "agreement" resolves none of the central issues.

Then there's the question of payment. What are we to make of the sentence: "New car inventory for cost in addition to the purchase price of all other assets"? Massey contends that APAG agreed to pay for cars on hand on top of the $300 million. His dealerships collectively held about $63 million in inventory in May 1997, so Massey submits that the full selling price was $363 million. Yet Massey had acquired this inventory on credit, and if APAG was buying all of the stock in the corporations that operated the dealerships then it was acquiring as well the dealerships' obligation to General Motors, which had financed the inventory. So by Massey's account APAG had agreed to pay *twice* for vehicles on hand: once to Massey and again to General Motors. Any document that admits of such commercial insanity can't be treated as definitive. There are lots of other loose ends, but we have said enough to show that APAG and Massey did not reach an enforceable contract.

This conclusion does not quite wrap up the proceeding. Unjust enrichment is an equitable doctrine, and Massey may

have equitable defenses. The most prominent of these would be detrimental reliance on a belief that a contract existed. That is to say, Massey might have acted *as if* this were an exclusive option and turned down other suitors until it became clear that APAG would not perform. Massey made such an argument in the bankruptcy court, which held otherwise in findings that are not clearly erroneous. The bankruptcy judge concluded that the other potential bidders to which Massey referred either predated APAG or expressed their interest after APAG departed, so that there was no reliance and no detriment. The bankruptcy judge did, however, deduct $32,000 from the amount of restitution to cover Massey's costs in preparing to perform (principally, his expense in retaining a major accounting firm to start the process of creating properly audited financials, which would be essential for APAG's contemplated public offering of securities).

According to Massey, APAG should not receive equitable relief because O'Neal and Baker have acted with unclean hands. See *Stachnik v. Winkel*, 394 Mich. 375, 230 N.W.2d 529 (1975). But the facts to which he points—principally O'Neal's theft from APAG and Baker's failure to learn that his co-venturer had a prior conviction for fraud, and to monitor his conduct more closely—injured APAG's outside investors rather than Massey. Cf. *McKeighan v. Citizens Commercial & Savings Bank of Flint*, 302 Mich. 666, 671-72, 5 N.W.2d 524, 526-27 (1942). Massey recognized that O'Neal had sticky fingers. He knew, as Baker did not, about O'Neal's prior conviction for fraud (which among other things would have led GM to refuse to transfer the dealerships); Massey also knew, as Baker did not, that O'Neal had borrowed about $1 million from Massey earlier in the 1990s and failed to repay. It is easier to understand the events of May 1997 as Massey's attempt to turn the tables on O'Neal (or as their joint attempt to use the investors' capital to settle O'Neal's personal debt to Massey) than as inequitable conduct by APAG to Massey's detriment. Allowing Massey

to keep the deposit would harm only the innocent outside investors, who are the chief victims of O'Neal's misconduct. The bankruptcy judge did not abuse his discretion or commit clear error in concluding that the totality of circumstances calls for restitution under Michigan law.

AFFIRMED

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*