# STATE OF MICHIGAN

# COURT OF APPEALS

ROBERT WILLIAMS and DORIS WILLIAMS,

      Plaintiffs/Counter Defendants/Third Party Defendants-Appellees/Cross Appellants,

and

R AND R MINI MART, LLC, and RONALD S. WILLIAMS,

      Third Party Defendants-Appellees,

v

JAGBIR SRAN,

      Defendant/Counter Plaintiff-Appellant/Cross Appellee,

and

JJ MINI MART, INC,

      Defendant/Third Party Plaintiff-Appellant/Cross Appellee.

UNPUBLISHED
June 13, 2017

No. 330615
Montcalm Circuit Court
LC No. 2014-018718-PD

Before: GADOLA, P.J., and TALBOT, C.J., and GLEICHER, JJ.

PER CURIAM.

In this small-business dispute, appellants Jagbir Sran and JJ Mini Mart, Inc (JJMM) (collectively, appellants), appeal as of right the circuit court's verdict, following a bench trial, of no cause of action against all parties. Husband and wife cross-appellants Robert Williams (Robert) and Doris Williams (Doris) (collectively, the Williamses) claim their cross appeal from that same order. We affirm.

-1-

## I. FACTUAL BACKGROUND

This case arises out of a purported oral lease agreement between the Williamses and Sran concerning the Trufant Gas and Party Store (the store), which is owned by JJMM;[1] the real estate upon which the store is situated, which is owned by Sran; and the store's inventory. As summarized by the trial court, "[t]he facts leading to this law suit entail an elderly couple [i.e., the Williamses] wishing to purchase a party store so that their middle aged son, Ronald Williams [(Ronald)], could run the store and so they would have investment property to benefit their children and grandchildren."

Ronald and Sran became friends over time as Ronald patronized the store. Sometime in 2008 or 2009, Sran suggested that Ronald might lease the store and purchase its inventory, but Ronald declined, explaining that he lacked the financial wherewithal. Sran then suggested that Ronald approach his parents about leasing the store or providing Ronald the money to do so.

According to Robert, Sran approached the Williamses in September 2012 and offered to lease them the store "for whatever period of time" they wished, explaining that they would purchase the inventory on a temporary basis and, if they later decided that they did not wish to purchase the store, Sran would buy the inventory back. Sran testified that the parties agreed that the Williamses would provide a down payment on the inventory and maintain the then-current inventory value until they decided whether they wished to purchase the store. Robert acknowledged that Sran explained that the Williamses would be responsible for paying the store's expenses, and any expenses associated with the real estate, during the lease period, and Robert agreed. Several witnesses gave varying testimony concerning the contemplated duration of the lease agreement. When negotiating it, Robert "trusted [Sran] with everything."

According to both Robert and Ronald, Sran represented that the store generated average profits of $8 per hour and could generate $15 per hour if Ronald worked as the cashier. Conversely, Sran testified that such comments did not forecast expected profits but rather referred to the fact that Ronald could either pay an employee $8 per hour to serve as the cashier or could do so himself and thereby cut operational expenses.

Ultimately, the Williamses made a down payment in two installments. The Williamses began to pay monthly rent of $3,500, and Ronald managed the store, paying bills using a checking account held in JJMM's name.[2] The parties agree that the Williamses had an option to purchase the store, its inventory, and the related real estate, but the purchase price is disputed. Robert acknowledged that Ronald was permitted to operate the store—using the Williamses money—without any true oversight or accountability.

---

[1] JJMM is an "S" corporation that is evidently closely held by Sran.

[2] Although Ronald did not have authority to sign checks drawn against this account in his own name, he testified—and Sran agreed—that Sran gave him permission to sign in Sran's name.

When the store had insufficient funds to continue operating, the Williamses would write a check to Sran or JJMM, intending the funds as a "loan" and so indicating on the memo line. The Williamses ultimately "loaned" a total of $70,550 to the store. The Williamses also took cash advances on credit cards to loan money to the store and made "false" credit card purchases at the store, swiping their card and permitting Sran to charge their account in exchange for no goods or services rendered. In the end, the Williamses exhausted all of their savings and were left with substantial debts.

According to Robert, during the lease period Sran would arrive at the Williamses home drunk and request money from them. He was generally pleasant, but at times he referred to the Williamses as "stupid Americans" and used racial slurs. Sran also suggested that, to generate more money, the Williamses might sell personal belongings or mortgage their home. Sran "was in the store drunk constantly, harassing" the Williamses, "and also screwing around with the customers," which hurt sales. Other witnesses confirmed that Sran "would come in drunk all the time" to accost Ronald about money and that he repeatedly threatened to lock the Williamses out of the store unless he received more money. A store employee testified about a specific incident during which Sran came into the busy store drunk, went behind the counter, "grabbed" a small bottle of liquor, "chugged the whole thing right there," and with "customers . . . just standing there watching him," began vomiting "all over, right behind the counter." Another store employee—related to the Williamses—testified that Sran regularly took cash from the store, in amounts ranging from $100 to $400, and that "a lot of it was not documented."

The Williamses had been running the store for roughly a year—during which time they had requested a written agreement "[q]uite a few" times—before Sran presented them with a written lease. After reading the lease agreement, Robert found several of its terms objectionable, and he refused to sign it. Sran became "a little bit belligerent" and "upset" when Robert refused to sign.

On an evening in February 2014, the police were summoned to the store because of a verbal dispute between Ronald and Sran concerning money. Sran was visibly intoxicated. The police defused the situation and Sran was escorted home.

In April 2014, Sran took back possession of the store via self-help eviction, locking the Williamses out of the building. He was subsequently ordered to return possession to the Williamses, after which the Williamses maintained possession of the store until December 2014, relinquishing control after deciding that they simply "couldn't make a go out of it." According to Sran, the Williamses left a depleted inventory worth only $2,791.03, much of which consisted of expired grocery items that could no longer be offered for sale. Robert agreed that, despite knowing that they could have terminated the lease agreement at any time, the Williamses never actually discussed termination with Sran.

At trial, Christopher Powell was certified without objection as an expert "in the areas of accounting and fraud examination." Although Powell found it unusual for a business arrangement like that at issue in this case to be conducted without any written contracts, he concluded that there was insufficient evidence for him to opine whether any fraud had occurred. Based on only those amounts he was able to conclusively "document or trace" via forensic accounting, Powell determined that the Williamses owed Sran a total of $125,573.21, which

included unpaid rent, inventory, taxes, and various other debts incurred by JJMM for store expenses under the Williamses' management. In so concluding, Powell did not offset the money that the Williamses paid directly to JJMM in numerous checks while Ronald was managing the store—a total sum of $70,550—because Powell determined that such funds were subsequently used to pay store expenses for which the Williamses were responsible.

Following a two-day bench trial, the circuit court rejected the parties' various claims and counterclaims. This appeal and cross-appeal ensued.

## II. STANDARDS OF REVIEW

On appeal, the parties raise several claims of error, thereby implicating several standards of review. "This Court reviews de novo a trial court's interpretation of a contract and its resolution of any legal questions that affect a contract's validity, but any factual questions regarding the validity of the contract's formation are reviewed for clear error," *Wright v Wright*, 279 Mich App 291, 297; 761 NW2d 443 (2008), "giving particular deference to the trial court's superior position to determine witness credibility," *Miller-Davis Co v Ahrens Constr, Inc*, 495 Mich 161, 172; 848 NW2d 95 (2014). "A factual finding is clearly erroneous if there is no substantial evidence to sustain it or if, although there is some evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been committed." *Id*. at 172-173. On the other hand, "[t]his Court reviews de novo a court's decision concerning whether equitable relief is appropriate under specific facts," again reviewing related factual findings for clear error. *Workers' Compensation Agency Dir v MacDonald's Indus Products, Inc*, 305 Mich App 460, 480; 853 NW2d 467 (2014). Because promissory estoppel is a judicially created doctrine and an equitable remedy, its application is reviewed de novo. *James v Alberts*, 464 Mich 12, 14; 626 NW2d 158 (2001); *Johnson Family Ltd Partnership v White Pine Wireless, LLC*, 281 Mich App 364, 371; 761 NW2d 353 (2008).

## III. ANALYSIS

## A. MUTUAL ASSENT

Appellants argue that the trial court erred by deciding that no valid contract existed between the parties. We disagree.

To prevail on a breach of contract theory, a party must, among other things, prove by a preponderance of the evidence that a valid contract existed. *Miller-Davis*, 495 Mich at 178. "[A] contract requires mutual assent or a meeting of the minds on all the essential terms." *Kloian v Domino's Pizza LLC*, 273 Mich App 449, 453; 733 NW2d 766 (2006) (quotation marks and citation omitted). An "objective standard" is applied to determine whether a meeting of minds occurred, "looking to the express words of the parties and their visible acts, not their subjective states of mind." *Id*. at 454 (quotation marks and citation omitted). "Mere discussions and negotiation cannot be a substitute for the formal requirements of a contract." *Eerdmans v Maki*, 226 Mich App 360, 364; 573 NW2d 329 (1997).

Here, because there is no evidence that the Williamses ever sought to *exercise* their purported option to purchase the store, its inventory, and the associated real estate, the proper inquiry is not whether the parties expressed mutual assent about the price at which the Williamses could exercise that option. See *Johnson Family*, 281 Mich App at 393 ("Because an option is essentially an *offer* that requires strict compliance, it does not create an interest in land until the conditions of the offer are met." (citation omitted; emphasis added)). Rather, the germane inquiry is whether—based on the objective evidence presented at trial—the parties demonstrated an expression of mutual assent with regard to all essential terms of the lease agreement.[3]

The trial court correctly held that there was insufficient evidence of the parties' mutual assent on all essential terms. Duration "is an essential term of a valid lease." *McFadden v Imus*, 192 Mich App 629, 633-634; 481 NW2d 812 (1992), citing *Macke Laundry Serv Co v Overgaard*, 173 Mich App 250, 254; 433 NW2d 813 (1988) ("For an agreement to be a valid lease, it must contain the names of the parties, an adequate description of the leased premises, the length of the lease term and the amount of the rent."). Here, the parties presented evidence of the varying *subjective* understandings of Robert, Ronald, and Sran concerning the term of the lease agreement, but there was no evidence clearly establishing the express words and conduct of the parties at the offer-and-acceptance stage. Indeed, the parties failed to present evidence that Doris—a purported party to the lease agreement—ever received an offer, manifested acceptance, or was even informed of the alleged terms, let alone of the contemplated lease period.[4] Based on the limited evidence presented to it, the trial court did not err by determining that there was

---

[3] Conceptually, the inventory portion of the agreement *could* be perceived as distinct from the lease agreement. Viewed in that light, the inventory agreement might be governed by the uniform commercial code (UCC), MCL 440.2101 *et seq.*, which provides statutory rules under which the omission of specific terms is not generally fatal to the formation of a valid contract. See, e.g., MCL 440.2204(3). But "when parties enter into multiple agreements relating to the same subject-matter, we must read those agreements together to determine the parties' intentions." *Wyandotte Electric Supply Co v Electrical Technology Sys, Inc*, 499 Mich 127, 148; 881 NW2d 95 (2016). Moreover, the fact that an agreement involves a sale of goods does not necessarily mean that it is governed by the UCC. *Neibarger v Universal Cooperatives, Inc*, 439 Mich 512, 534; 486 NW2d 612 (1992). Here, the lease agreement and the inventory agreement were not separate agreements at all; rather, they were different parts of *one* contemplated agreement, the primary "thrust" of which regarded the lease of the store. Hence, we conclude that the UCC is inapplicable and that the agreement concerning the purchase of the store's inventory was nothing more than an incidental, albeit important, *portion* of the lease agreement.

[4] Nor have the parties presented any theory under which Doris might be bound by Robert's acceptance or by the actions of Ronald.

insufficient evidence to prove, by a preponderance of the evidence, that the parties mutually assented to all essential lease terms.[5]

## B. UNCLEAN HANDS

Appellants first contend that the trial court erred at the most fundamental level, applying the *equitable* doctrine of unclean hands to appellants' *legal* claims for breach of contract. We disagree.

It is true that "[a]n action for damages for a breach of contract is historically an action at law, not in equity." *Stroud v Glover*, 120 Mich App 258, 261; 327 NW2d 462 (1982). However, where, as in this case, no enforceable contract exists between parties, equitable theories may nevertheless be utilized to prevent unjust enrichment. See, e.g., *Kammer Asphalt Paving Co, Inc v East China Twp Sch*, 443 Mich 176, 185-186; 504 NW2d 635 (1993). Viewed in context, and given the presumption that the trial court knew and properly applied the law,[6] it is evident that the trial court's unclean hands ruling concerned such equitable, quasi-contractual theories, not the underlying breach of contract claim. In other words, the trial court ruled that, although Powell's testimony indicated that the Williamses had been unjustly enriched—having received the benefit of the store's use and its inventory while failing to pay fair value in return—the court would not afford appellants any equitable relief because Sran's hands were unclean.

Hence, the determinative issue is whether the trial court erred by deciding that Sran's hands were unclean. We conclude that it did not.

It has long been recognized that equity will "protect those persons unable to protect themselves." *In re Sprenger's Estate*, 337 Mich 514, 524; 60 NW2d 436 (1953). "The very foundation of a court of equity is good conscience," *Society of Good Neighbors v Van Antwerp*, 324 Mich 22, 28; 36 NW2d 308 (1949), and "[t]he clean hands maxim is an integral part of any action in equity," *Stachnik v Winkel*, 394 Mich 375, 382; 230 NW2d 529 (1975). It "is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." *Id.* (quotation marks and citations omitted). "Since the clean hands maxim is designed to preserve the integrity of the judiciary, courts may apply it on their own motion even though it has not been raised by the parties or the courts below." *Id.*

For purposes of this doctrine, "[t]he misconduct which will move a court of equity to deny relief must bear a more or less direct relation to the transaction concerning which complaint is made. Relief is not denied merely because of the *general* morals, character or conduct of the

---

[5] Given this conclusion we need not, and therefore do not, consider whether the trial court properly decided that the parties' purported agreement might have been rendered unenforceable—had it existed—by the statute of frauds. The issue is moot. See *Anglers of AuSable, Inc v Dep't of Environmental Quality*, 489 Mich 884 (2011).

[6] See *Charles A Murray Trust v Futrell*, 303 Mich App 28, 44; 840 NW2d 775 (2013).

party seeking relief." *McKeighan v Citizens Commercial & Sav Bank of Flint*, 302 Mich 666, 671; 5 NW2d 524 (1942) (emphasis added). A party's hands may be deemed unclean on the basis of "any willful act in regard to the matter in litigation, which would be condemned and pronounced wrongful by honest and fair-minded" individuals. *Rose v Nat'l Auction Group, Inc*, 466 Mich 453, 466; 646 NW2d 455 (2002) (quotation marks and citation omitted).

In support of its decision that Sran's hands were unclean, the trial court provided substantial factual findings:

> This Court affirmatively finds that [Sran] comes to this Court with unclean hands. Without question, given the testimony of the police officers and employees, he frequented the store while intoxicated and applied significant pressure to Ron[ald] and Robert Williams to come up with money or he would lock them out of the store. He along with a female involved in his businesses went to the Williams[es]' home and pressured them to mortgage their home or liquidate assets to get money from them. As further evidence of [Sran]'s unclean hands, he locked the [Williamses] out of the store, as witness Barnwahl [sic] testified he had done to him in 2009, when he should have pursued lawful means of regaining possession of the store . . . . Further . . . , [Sran's] land contract holder, testified that one of the terms of their written contract was that he could not lease the store until she was paid off. She testified, and [Sran] did not dispute, that he has not yet paid off that contract and that he had not obtained her agreement to lease the store.

> In short, while this Court does not find that [Sran] committed fraud, he did take advantage of the circumstances of this elderly couple and their rather naive son in a manner that will not be tolerated or condoned by this Court.

We discern no clear error in the trial court's factual findings, all of which are reasonable and supported by the record evidence.

Appellants do not contest the trial court's decision that the Williamses' initial "lockout" eviction was unlawful, and there is legal support for that conclusion. See *Deroshia v Union Terminal Piers*, 151 Mich App 715, 717; 391 NW2d 458 (1986) (discussing Michigan's "antilockout" law). Additionally, the trial court's factual findings support the conclusion that Sran engaged in conduct related to the parties' lease agreement that would be condemned and pronounced wrongful by honest and fair-minded individuals. Specifically, the record indicates that he gained the trust of, then preyed upon, an unsophisticated, elderly couple, exploiting their vulnerabilities. When "mental weakness and failure of memory are accompanied by other inequitable incidents, and are taken undue advantage of through their means, equity not only may but will interpose with defensive or affirmative relief." *Mettetal v Hall*, 288 Mich 200, 215; 284 NW 698 (1939). Moreover, Sran engaged in conduct that sabotaged the value of the business he had leased the Williamses, then locked them out instead of pursuing a lawful eviction. Considering the entire record de novo, we conclude that the trial court did not err by determining that Sran's hands were unclean.

## C. FRAUD IN THE INDUCEMENT

Finally, the Williamses contend that the trial court erred by concluding that the Williamses had failed to prove their claim of fraud in the inducement against Sran. We disagree.

The Williamses' argument of this issue, which is premised on the presumption of fraudulent intent that may arise when certain "badges of fraud" indicate that a transfer was intended to defraud a creditor,[7] is misplaced here. To prevail on a claim of fraud in the inducement, a party must prove six elements:

> (1) the defendant made a material representation; (2) the representation was false; (3) when the defendant made the representation, the defendant knew that it was false, or made it recklessly, without knowledge of its truth and as a positive assertion; (4) the defendant made the representation with the intention that the plaintiff would act upon it; (5) the plaintiff acted in reliance upon it; and (6) the plaintiff suffered damage. [*Custom Data Solutions, Inc v Preferred Capital, Inc*, 274 Mich App 239, 243; 733 NW2d 102 (2006) (quotation marks and citations omitted).]

"Fraud will not be presumed," and the party asserting it has the burden of proof by clear and convincing evidence," *Hi-Way Motor Co v Int'l Harvester Co*, 398 Mich 330, 336; 247 NW2d 813 (1976), which is "the most demanding standard applied in civil cases," *In re Martin*, 450 Mich 204, 227; 538 NW2d 399 (1995).

We perceive no error in the trial court's determination that the Williamses failed to present clear and convincing evidence of fraud. Here, the only misrepresentation cited by the Williamses is Sran's alleged representation that the store would average profits of $8 per hour while open, plus more if Ronald worked as the cashier. But by ruling as it did, the trial court implicitly accepted Sran's testimony that his cited comments did not forecast *expected* profits based on past performance but rather referred to the fact that Ronald could serve as cashier himself and reap any *resulting* profits that might be gained by not paying an employee. Given the contrary testimony of Robert and Ronald, the trial court's acceptance of Sran's testimony represents a credibility determination to which we will defer. See *Hodge v Parks*, 303 Mich App 552, 555; 844 NW2d 189 (2014) ("Special deference is afforded to a trial court's factual findings that are based on witness credibility.").[8]

---

[7] See generally *Dillard v Schlussel*, 308 Mich App 429; 865 NW2d 648 (2014).

[8] To the extent that the Williamses also cursorily argue that the trial court erred by rejecting their claim for promissory estoppel, they have abandoned that claim of error by failing to adequately brief the issue. See *Greater Bethesda Healing Springs Ministry v Evangel Builders & Constr Managers, LLC*, 282 Mich App 410, 413; 766 NW2d 874 (2009). The Williamses have—aside from one block quotation of a persuasive (i.e., not binding) authority—spent only one sentence analyzing this issue, and that sentence provides virtually no application of facts to the relevant law. Indeed, their argument fails to *list* any of the four essential elements for a claim of

Affirmed.

/s/ Michael F. Gadola
/s/ Michael J. Talbot
/s/ Elizabeth L. Gleicher

---

promissory estoppel, let alone to analyze whether those elements are satisfied under the facts at bar. We will not provide such analysis on their behalf. See *McLean v Dearborn*, 302 Mich App 68, 87; 836 NW2d 916 (2013) (noting that it is not the role of the judiciary to advocate on behalf of litigants).