**COUNTY OF SANTA CLARA, Plaintiff,**

v.

**UNITED STATES FIDELITY AND GUARANTY COMPANY, et al., Defendant.**

**No. C–93–20169 RPA.**

United States District Court, N.D. California.

Oct. 25, 1994.

Michael D. Gallagher, Kathleen M. Carson, Shelby L. Mattioli, German, Gallagher & Murtagh, Philadelphia, PA, Mark B. Schellerup, Robinson & Wood, Inc., San Jose, CA, for Stonewall Ins. Co.

Cathy L. Croshaw, Harvey T. Elam, Luce, Forward, Hamilton & Scripps, San Francisco, CA, for Employers Reinsurance Corp. ("ERC").

John K. Kirby, Haims, Johnson, MacCowan & McInerney, Oakland, CA, for Unigard Mut. Ins. Co.

Anthony R. Gambardella, Rivkin, Radler & Kremer, Uniondale, NY, Christopher A. Crevasse, Rivkin, Radler & Kremer, Santa Rosa, CA, for Chicago Ins. Co.

James G. Driscoll, Bullivant, Houser, Bailey, Pendergrass & Hoffman, Rancho Cordova, CA, for U.S. Fidelity and Guar. Co.

James P. Barber, Michael A. Gevertz, Sarah K. Chang, Hancock, Rothert & Bunshoft, San Francisco, CA, for Caryl Anthony Vaughn Gibbs and Co., sued and served as Certain Underwriters at Lloyd's of London, Stronghold Ins. Co. Ltd., Yasuda Fire & Marine Ins. Co. (U.K.) Ltd., Turegum Ins. Co., Excess Ins. Co. Ltd., Assicurazioni Generali.

Patricia Van Dyke, Jones, Day, Reavis & Pogue, Los Angeles, CA, Kathryn Berry, County of Santa Clara, San Jose, CA, for County of Santa Clara.

### ORDER GRANTING MOTION FOR RECONSIDERATION

AGUILAR, District Judge.

Defendant Employers Reinsurance Corporation (ERC) moves for reconsideration of this court's June 16, 1994 order granting Plaintiff County of Santa Clara ("County") and Co–Defendant United States Fidelity and Guaranty Company's (USF & G) motion for summary judgment and granting USF & G's motion for determination of good faith settlement. In the alternative, ERC asks this Court to certify the June 16 order for immediate appellate review. In July 1994, this case was transferred from Judge Ware to the undersigned for all purposes. For the reasons set forth below, ERC's motion for reconsideration is GRANTED.

### BACKGROUND

The factual background of this case is fully set forth in Judge Ware's June 26, 1994 order, 859 F.Supp. 396. Nevertheless, the Court will briefly review the facts relevant to this motion.

This coverage dispute has its origins in a Remedial Action Order ("RAO") issued by the California Department of Health Services (now known as "CAL EPA") to The County of Santa Clara in 1987. The RAO requires the County to remediate mercury contamination at the Alamaden Quicksilver Park (the "Site"). The County acquired the Site through purchases and condemnation proceedings in 1973 and 1981. The RAO estimates that the remediation will cost somewhere between $1.8 and $7 million. Mining Companies had excavated and refined mercury on this Site for over 140 years. After receiving the RAO, the County filed actions for contribution against other potentially responsible parties named in the RAO.

The County is insured by comprehensive general liability insurance policies purchased from several insurance companies, all of which provide defense and indemnity coverage for third party claims. The County tendered defense of the RAO to its insurers. When no defense was forthcoming, the County filed this action against its insurers. On November 1, 1993, the Court entered partial summary judgment in favor of the County, finding that its primary insurer, USF & G, had a duty to defend the County and pay the costs of investigating contamination mandated by the RAO.

In January 1994, the County and USF & G entered into an agreement under which USF & G agreed to pay the County $75,000 to settle bad faith claims and $150,000 for defense costs. USF & G further agreed to deposit an additional $500,000 into escrow for the County. This was an amount calculated to represent USF & G's maximum potential property damage obligation. This amount also represented USF & G's total liability coverage under the policy. The escrow instructions provided that the $500,000 would be released provided that two contingencies occurred: (1) that the County and USF & G prevail on their motion for summary judgment seeking a determination that USF & G's agreement to fund the escrow exhausted primary indemnity limits and that ERC must then assume the defense of the County under the terms of the ERC umbrella policy, and (2) that USF & G prevail on its motion for determination of good faith settlement. If these contingencies occurred, USF & G believed that it would have extinguished its defense and indemnity obligations. USF & G felt that it could then exit gracefully, leaving ERC to assume the defense of the County. The Court granted both motions, and ERC filed this motion for reconsideration.

### Legal Standard

■ Reconsideration is appropriate if the court (1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there has been an intervening change in the controlling law. *School Dist. No. 1J, Multnomah County v. ACandS, Inc.,* 5 F.3d 1255, 1263 (9th Cir.1993); *Kern–Tulare Water District v. City of Bakersfield,* 634 F.Supp. 656, 665 (E.D.Cal.1986). Other, highly unusual, situations may also warrant reconsideration.

### Analysis

This dispute boils down to a single question of first impression: in an environmental action involving the issuance of an RAO,

what must happen before a primary carrier may pay out its indemnity limits and thereby extinguish its duty to defend? As pointed out in the initial order, this question is not an easy one.

In the typical coverage case, a primary insurer validly exhausts its indemnity limits when it pays a settlement or judgment resolving third party claims; the payment of the settlement or judgment then triggers excess coverage. In an environmental action like this one where the insured is faced with an RAO, however, there is no settlement or judgment in the usual sense of the words. For these reasons, it is difficult to ascertain precisely at which point indemnity limits may be validly exhausted.

ERC argues that USF & G cannot extinguish its duty to defend by tendering its primary indemnity limits directly to the County. ERC maintains that under the terms of its policy and established principles of California insurance law USF & G can validly exhaust its indemnity limits only through settlement or payment of a judgment in resolution of third party claims. The RAO is neither of these, ERC argues, for two reasons: (1) the RAO does not require the County to incur any costs, which could even potentially be considered indemnity liability, before CAL–EPA approves a remediation plan, and (2) even if a plan including remediation costs in excess of primary insurance limits is approved, the plan does not establish liability because the County may assert affirmative defenses which, if successful, will result in a judgment of no liability under the RAO. CAL–EPA has yet to approve a remediation plan.

ERC's excess policy's exhaustion provision states:

Loss Payable: Liability under this policy with respect to any occurrence shall not attach unless and until the Insured, or the Insured's underlying insurer shall have paid the amount of the Insured's primary limit on account of such occurrence. The Insured shall make a definite claim for any loss for which the Corporation may be liable under this policy within 12 months after the Insured shall have paid an amount of ultimate net loss in excess of the Insured's primary limit or after the Insured's liability shall have been fixed and rendered certain either by final judgment against the Insured after actual trial or by written agreement of the Insured, the claimant and the Corporation.

The ERC policy defines ultimate net loss as:

[T]he total sum which the Insured, or any company as his insurer, or both, become obligated to pay as damages because of personal injury or property damage, either through adjudication or compromise with the written consent of the Corporation.

■■■■ Under California law, it is clear that "[all] primary insurance must be exhausted before liability attaches under a secondary policy." *Iolab Corp. v. Seaboard Sur. Co.*, 15 F.3d 1500, 1505 (9th Cir.1994), quoting *Olympic Ins. Co. v. Employers Surplus Lines Ins. Co.*, 126 Cal.App.3d 593, 599, 178 Cal.Rptr. 908 (1981). This means that an excess insurer has no duty to defend or contribute to defense costs until primary limits are exhausted in resolution of third party claims against the insured. *See Signal Companies, Inc. v. Harbor Insurance Co.*, 27 Cal.3d 359, 369, 165 Cal.Rptr. 799, 805, 612 P.2d 889, 895 (1980); *Pacific Indemnity Co. v. Fireman's Fund Insurance Co.*, 175 Cal. App.3d 1191, 1196–1197, 223 Cal.Rptr. 312, 314 (1985). Moreover, the primary insurer cannot extinguish its defense obligation simply by tendering its indemnity limits to the insured and walking away from the fray—a tempting maneuver when it appears that defense costs will exceed indemnity limits. A leading insurance authority explains why courts look askance at this ploy:

Such action invites a change of attorneys and other staff, condemned in other decisions, and can subject the insured to questions as to who will provide him with a defense. It also allows the primary insurer to abandon the insured simply because it finds the costs of handling burdensome and thus escape its responsibility under the policy. The fact that there is an excess insurer in the picture should not alter the obligation of the primary insurer who has a responsibility to the insured as well as the excess insurer.

Appleman, *Insurance Law and Practice,* § 4682 at pp. 32–33.

■ Thus, ERC is correct that USF & G cannot validity extinguish its defense obligation by merely tendering its $500,000 indemnity limits to the County. And it is equally clear that the County's acceptance of the indemnity limits and acquiescence in USF & G's departure does not make a difference vis a vis ERC's obligations. Under the ERC policy and California insurance law, in order to constitute a valid exhaustion of primary coverage which triggers ERC coverage, the payment must be made to satisfy an obligation arising out of either an adjudication or a compromise of a third party claim. Payment of the policy limits directly to the County in the absence of liability to a third party does not meet this condition.

The County asserts that the RAO is the equivalent of an adjudication of liability because it mandates that the County remediate property damage at the Site at an estimated cost well in excess of primary policy limits. However, a reading of the RAO reveals that it does not require the County to incur any indemnity liability in the form of clean-up costs before CAL–EPA approves a remediation plan. Initially, the RAO only mandates that the County investigate mercury contamination at the Site—which this Court has determined is a defense cost—and develop a remediation plan for approval by CAL–EPA. Until a plan is approved, the County may incur defense costs, but it cannot have indemnity liability. Thus, USF & G cannot validly exhaust its policy limits solely on the basis of the issuance of the RAO. After all, it is possible, albeit unlikely given the current response cost estimates, that the plan will fix remediation costs below USF & G's $500,000 policy limits, in which case ERC's coverage would never be triggered.

■ So far so good for ERC. The next step, however, is to determine whether the approval of the remediation plan, which requires the County to incur clean-up costs, gives rise to present indemnity liability sufficient to permit exhaustion of primary limits. ERC maintains that the RAO, even after plan approval, does not impose liability because the County has the right to appeal the

RAO and the right to refuse to comply with it on the basis of defenses available under the Health & Safety Code. ERC contends that if the County complies with RAO without litigating its defenses, then the County is essentially stipulating to liability and making a voluntary payment—something it does not have the right to do under its insurance policies. The County responds that, while it can appeal the RAO, it still must begin remediation upon approval of the remediation plan because an appeal does not stay enforcement of the RAO. The County also argues that ignoring the RAO is not a viable option because of stiff statutory penalties for noncompliance. The Court finds the County's arguments persuasive.

ERC is right that a potentially responsible party may seek judicial review of an RAO. However, the Health & Safety Code is designed to ensure that hazardous waste sites are cleaned up as quickly as possible. In keeping with this objective, the Health & Safety Code specifically provides that the filing of a writ of mandate to review a final remedial action plan "shall not stay any removal or remediation specified in the final plan." Health & Safety Code § 25356.1(g)(1). As a result, the filing of an appeal does not relieve the County of its obligation to remediate the Site pursuant to the RAO. The County remains liable for the remediation pending the appeal. Thus, contrary to ERC's assertion, the absence of a stay means that the RAO does in fact impose present liability despite the availability of an appeal.

The second course of action proposed by ERC—that the County ignore the RAO and force the state to come after it—also fails to alleviate the County of immediate liability under the RAO. A potentially responsible party may decline to follow an RAO if there is sufficient cause to believe that it is not liable for the remediation. When a party chooses not to comply with the RAO, the state normally conducts the remediation itself and then sues the recalcitrant party to recover its costs. The party may then defend against the state's cost recovery action by asserting affirmative defenses available

under the Health & Safety Code.[1] However, a party who elects not to comply with the RAO is running a big risk:

> [a]ny person subject to a removal or remediation action order ... who does not comply with that order without sufficient cause shall be subject to a civil penalty of not more than $25,000 for each day of noncompliance.

Health & Safety Code § 25359.2.

Given that the County faces substantial penalties if it defies the RAO and then loses on its affirmative defenses in the state's cost recovery action, it really has no meaningful alternative than to start cleaning up the Site when the remediation plan is approved.[2] So while ERC is technically correct that the County could simply ignore the RAO and sit back and wait to be sued, this choice is more theoretical than real considering the dire consequences of inaction. The result ERC urges would place the County in an impossible dilemma: begin remediation pursuant to the RAO and forfeit excess coverage, or defy the RAO by doing nothing and risk incurring huge penalties which are not covered under the insurance policies. Whatever its form, the harsh penalties for non-compliance make the RAO, after a remediation plan is approved, the functional equivalent of a final adjudication of liability sufficient to exhaust primary indemnity limits and trigger ERC's defense obligation. The County's remediation expenditures simply cannot be labeled "voluntary payments" in light of the threat of penalties. Ironically, the County's cooperation may ultimately save ERC money. It is no secret that response costs are typically higher when the state or federal government conducts the remediation on its own.

Policy considerations also favor the County. ERC's position would frustrate the purpose behind the Health & Safety Code and CERCLA and pose a danger to the public. As mentioned earlier, the primary purpose behind the Health & Safety Code and CERCLA is the prompt clean-up of hazardous waste sites. *U.S. v. M/V SANTA CLARA I,* 819 F.Supp. 507, 510 (D.S.C.1993). A rule requiring an insured to hold back from remediating until forced would cause long delays in the clean-up process and exacerbate the threat to public safety. This rule would also undermine CERCLA and the Health & Safety Code's policy of encouraging private parties to conduct remediation rather than the state or federal government. *See* H.R.Rep. No. 253, 99th Cong., 2d Sess., pt. I at 101 (1985), U.S.Code Cong. & Admin.News 1986, pp. 2835, 2883 ("negotiated private party actions are essential to an effective program for clean-up of the nations hazardous waste sites and it is the intent of this Committee to encourage private party cleanup at all sites").

In sum, the County may technically have the choice to refuse to comply with the RAO until forced by a court. However, the lack of a stay pending appeal and the substantial penalties for noncompliance give the County no real alternative: it must begin remediation at the Site in accordance with the RAO. With no tenable way to contest liability under the RAO before having to begin remediation, the County is in effect faced with a final judgment upon approval of the remediation plan. Accordingly, the County will incur indemnity liability sufficient to validly exhaust primary coverage when CAL–EPA approves

---

**1.** The Health & Safety Code expressly incorporates the defenses available to potentially responsible parties under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 et seq., including the "innocent purchaser" defense, which absolves persons who acquired contaminated property without actual or constructive knowledge of the contamination, and the "eminent domain defense", which protects government entities that acquired property through their eminent domain authority. *See* 42 U.S.C. § 9601(35)(A)(i), (iii). The County is in the process of asserting these defenses in underlying contribution actions.

**2.** The Health & Safety Code also provides that any person who fails, without sufficient cause, to comply with a remediation order is liable to the state for treble damages. Health & Safety Code § 24359(a). However, there is an exception to this provision which appears to exempt the County. Section 25359(b) provides that treble damages will not be imposed against "an owner of real property who did not generate, treat, transport, store, or dispose of any hazardous substance" at the Site.

a remediation plan for the Site which requires the County to incur response costs in excess of the $500,000 primary indemnity limits.

### CONCLUSION

The Court clearly erred in holding that the issuance of the RAO was sufficient to trigger coverage under the ERC policy. The initial order is hereby vacated. Primary coverage cannot be exhausted until a remediation plan is approved which clearly establishes that the costs of remediation will exceed the primary indemnity limits. At that point, USF & G can tender its policy limits to the County and thereby extinguish its duty to defend. ERC will then be obligated to provide a defense to the County.

IT IS SO ORDERED.