FRANKENMUTH MUTUAL INSURANCE COMPANY, INC v
CONTINENTAL INSURANCE COMPANY

MICHIGAN EDUCATIONAL EMPLOYEES MUTUAL
INSURANCE COMPANY v TRANSAMERICA INSURANCE
CORPORATION OF AMERICA

Docket Nos. 98342, 99439. Argued April 6, 1995 (Calendar Nos. 10-
11). Decided August 22, 1995.

Frankenmuth Mutual Insurance Company, Inc., brought a declar-
atory judgment action in the Genesee Circuit Court against
Continental Insurance Company and other insurers, seeking
contribution for costs incurred in defending an underlying
lawsuit in which a bicyclist was killed in a collision with a
pick-up truck insured by Continental, whose driver was insured
by another company. Each policy declared primary coverage for
accidents involving vehicles owned by a named insured, and
excess coverage respecting nonowned vehicles. Neither com-
pany limited its duty to defend when the coverage was excess.
The court, Judith A. Fullerton, J., ruled that Continental was
the primary insurer for all defendants and ordered it to re-
imburse Frankenmuth up to its policy limits. The Court of
Appeals, DOCTOROFF, C.J., and MICHAEL J. KELLY and GRIBBS,
JJ., affirmed in an unpublished opinion per curiam (Docket No.
138157). Continental appeals.

Michigan Educational Employees Mutual Insurance Company,
brought a declaratory judgment action in the Jackson Circuit
Court against Transamerica Insurance Corporation of America
and others, seeking to be excused from an underlying lawsuit
upon payment of policy limits to a passenger who was seriously
injured in an accident involving its insured's automobile. The
vehicle was driven by the insured's son or another person
insured by Transamerica, each of whom claimed the other was
the driver. It was agreed that MEEMIC provided primary cover-
age, and Transamerica only excess. The court, Alexander C.
Perlos, J., ruled that MEEMIC had an obligation to provide
defenses until it reached a settlement of the claims against its
insureds, and thereafter, Transamerica would owe a duty to
defend its insured. It also denied MEEMIC's motion for re-
imbursement of its defense costs. The Court of Appeals,

Connor and A. A. Monton, JJ. (Michael J. Kelly, P.J., concurring), reversed, ruling that Transamerica had a duty to defend Transamerica's insured, commencing when MEEMIC filed the declaratory judgment action, and that Transamerica was liable for a pro-rata share of defense costs when both insurers had a duty to defend, namely, after the filing of the declaratory judgment action, as well as all defense costs after MEEMIC's duty ended upon payment of its policy limits (Docket No. 144945). Transamerica appeals.

In an opinion by Justice Weaver, joined by Chief Justice Brickley, and Justices Boyle and Riley, the Supreme Court *held:*

In true excess insurance cases, the true excess insurer is liable for defense costs only after the primary insurer is excused under the terms of its policy.

1. In these cases, the additional insurers are not true excess insurers; rather, their duty to defend, and thus their responsibility for defense costs is triggered by their insureds' coincidental involvement in the underlying accidents. The issue to be resolved is the allocation of defense costs between these additional insurers where there is a clearly designated primary insurer.

2. One difficulty with the pro-rata approach is determining how the insurers' interests align so that defense costs can be fairly apportioned. Requiring an excess insurer to participate pro rata on notice that the claim might exceed the primary insurer's limits effectively forces the excess insurer to be a coinsurer despite the language of its policy. Such a result is contrary to the excess insurer's reasonable expectations, and ignores the language of insurance policies that typically anticipate the involvement of other insurance.

3. Once it is clear that the additional insurers are not true excess insurers, the inquiry must proceed to the terms and conditions of the policies involved. Where the status of the primary insurer is clear, the primary insurer is liable for the defense and its costs until its limit is paid. Additional insurers who by the terms of their policies also cover some loss are coincidental excess insurers. The duty of these coincidental excess insurers may vary depending on the terms of their policies. Where there are competing other insurance clauses, the Supreme Court will endeavor to reconcile them. Similarly, where there are disputes regarding the potentially conflicting duties to defend and to bear defense costs between multiple insurers for multiple insureds, the policy terms at issue should be honored to the greatest extent possible.

4. In *Frankenmuth,* Frankenmuth Mutual is an excess in-

surer under the facts of the case. Given the policy language, Frankenmuth's duty to defend is analogous to a true excess insurer, and, therefore, Frankenmuth should not be liable for defense costs until Continental is excused under the terms of its policy. In MEEMIC, the Transamerica policy makes clear that when the other-automobile provision was triggered, it would be the excess insurer. Therefore, it is appropriate to apply the rule for true excess insurers to require that MEEMIC should have defended and paid the defense costs up to its limit. Thus, Transamerica is liable for the defense and costs incurred only after MEEMIC is excused under the terms of its policy.

*Frankenmuth* affirmed.

*MEEMIC* reversed.

Justice CAVANAGH, concurring in part and dissenting in part, stated that while defense costs should be borne by the primary and excess insurers pro rata on the basis of their shares of the underlying liability, and thus *MEEMIC v Chalfant* should be reversed, because Continental wrongly refused to provide a defense to its insured, it should bear the costs of the underlying action.

Because the insurers have no contract between themselves, equitable subrogation may be employed to compensate an insurer for costs it incurs in defending an insured when another insurer is also contractually required to provide the defense. Nevertheless, where a primary insurer wrongly fails to provide a defense, equitable subrogation may not be used to force the excess insurer, who provided the entire defense in the first place, to pay a pro-rata share of the defense costs.

Justice LEVIN, joined by Justice MALLETT, dissenting, stated that defense costs should be borne by the primary and excess insurers pro rata on the basis of their shares of the aggregate underlying liability as determined by settlement or adjudication.

Where there is more than one insurer, the doctrine of equitable subrogation allows an insurer who has provided a defense to stand in the shoes of the insured and recover from the insurer who wrongly failed to defend. The duty to defend is broader than and independent of the duty to pay for covered liabilities. It commences whenever the facts set forth in the pleadings would require coverage, or unpleaded facts or a set of facts, known by the insurer to be true, bring the claim within the coverage of the policy. However, the insurer providing the defense is not entitled to stand in the shoes of the insured until it has fully discharged its own duty to provide a defense for the insured. It, therefore, may not require a nondefending excess

insurer to actually join in conducting the defense. Once an insurer has completed its defense, it is equitably subrogated to the rights of the insured and ought to be able to recover costs from the insurer who has avoided its duty to defend. Even where the primary insurer has paid its policy limits in partial settlement of a claim, contribution between primary and excess insurers should turn on their respective shares of the final liability.

In each of the instant cases, the excess insurer accepts responsibility for all defense costs after the primary insurer has paid its limits in partial settlement of the underlying claim. The excess insurers seek to avoid bearing part of the defense costs for the period during which the primary insurer was also responsible for defense. But in these cases both insurers owed a duty to defend the insured. Allocating defense costs on the basis of the shares of the final underlying liability encourages primary insurers to continue providing a defense even when it becomes clear that their policy limits will, or are likely to, be exceeded. A temporal rule would encourage a primary insurer to pay and leave prematurely, which might disrupt the defense of the insured, possibly engendering additional litigation between the insurers and, in some cases, the insured.

Proration according to total liability only includes defense costs where the insurers' respective interests closely align so that they would pursue compatible strategies on behalf of the insured. It does not extend to true excess policies, where the duty to defend is limited.

204 Mich App 440; 516 NW2d 93 (1994) reversed.

*Douglas I. Buck, II*, for plaintiff Frankenmuth Mutual Insurance Company.

*Nelson & Kreuger, P.C.* (by *Jon J. Schrotenboer*), for plaintiff Michigan Educational Employees Mutual Insurance Company.

*Plunkett & Cooney, P.C.* (by *Mary Massaron Ross*), for defendant Continental Insurance Company.

*Highland & Zanetti, P.C.* (by *J. R. Zanetti, Jr.,* and *Duncan H. Brown*), for defendant U.S.A.A. Casualty Insurance Company.

*Dilley, Dewey, Damon & Condon, P.C.* (by
*Jonathan S. Damon*), for defendant Transamerica
Insurance Corporation of America.

WEAVER, J. The issue presented in these consoli-
dated cases is the allocation of defense costs
among multiple no-fault insurers, each of whom to
some degree may be liable for a loss arising out of
a single automobile accident. Although the dis-
sent's pro-rata rule is alluring for its simplicity, as
applied, it fails to adequately give meaning to the
intent of the policy language and will serve only to
further agitate a sufficiently litigious area of the
law.[1] We take this opportunity to clarify who
should bear defense costs where seemingly over-
lapping duties to defend multiple insureds arise.

The duty to defend is defined by policy lan-
guage,[2] and, logically, the burden of the cost of
defense should follow the duty to defend. The
approach outlined herein in no way seeks to erode
an insurer's duty to defend its insured and should
not be applied to leave the insured without the
coverage due. Rather, this approach attempts to
give meaning to frequently obtuse policy language,
while establishing a consistent analytical frame-
work. For the following reasons, we affirm the
decision of the Court of Appeals in *Frankenmuth*
and reverse the Court of Appeals decision in
*MEEMIC*.

I

A. *FRANKENMUTH MUTUAL v CONTINENTAL*

Eric Bosco was killed when he was hit by a
truck driven by Chris Bauermeister, an employee

---

[1] We have acknowledged that it is a priority to give meaning to
policy language. See, e.g., *St Paul Fire & Marine Ins Co v American
Home Assurance Co,* 444 Mich 560; 514 NW2d 113 (1994).

[2] *Stockdale v Jamison,* 416 Mich 217, 224; 330 NW2d 389 (1982).

of Flint Tent and Awning. The truck was owned
by Kenneth Cook, president of Flint Tent and
Awning, and Bauermeister was a permissive user.
Continental Insurance provided $500,000 coverage
for the truck, Cook as its owner, and Bauermeister
as a permissive user. Flint Tent and Awning car-
ried a $250,000 policy with Frankenmuth. In addi-
tion to his no-fault coverage with Continental,
Cook carried a $1 million umbrella policy with
Auto-Owners Insurance Company. Bauermeister
carried his own no-fault and umbrella insurance
with USAA Casualty Insurance Company for
$100,000 and $1 million respectively. However, the
question before us affects only the liabilities of
Continental and Frankenmuth.

The Bosco family filed suit, and Frankenmuth
immediately provided a defense for Flint Tent and
Awning. Continental refused to participate in the
defense, but subsequently acknowledged that it
was the primary insurer. Frankenmuth brought
this action against Continental seeking a declara-
tory judgment that Continental, as primary in-
surer, was obligated to provide a defense up to its
policy limits and that Continental should re-
imburse Frankenmuth for defense costs incurred
before settlement. The trial court agreed with
Frankenmuth and ordered Continental to re-
imburse Frankenmuth. The Court of Appeals af-
firmed, and Continental appealed.

### B. *MEEMIC v CHALFANT*

Trevor Chalfant was seriously injured in a one-
car accident. Either Jack Perry or Michael Hinkle
was driving the car, but neither will admit doing
so. The car was owned by Hinkle's father who
carried a $100,000 insurance policy with Michigan
Educational Employees Mutual Insurance Com-

pany (MEEMIC). Perry's father carried a $250,000
policy with Transamerica that covered his son's
permissive use of vehicles not owned by the Perry
family.

MEEMIC, as the insurer of the vehicle, assumed
the defense on behalf of the Hinkles and Perry.
MEEMIC then filed an action seeking to pay the
limits of its policy and be excused from the de-
fense. MEEMIC named Transamerica as a defen-
dant and sought reimbursement for the cost of
defending Perry before MEEMIC's offer of settle-
ment. The circuit court held that it was MEEMIC's
responsibility to defend the Hinkles and Perry
until MEEMIC had paid its policy limit and that
Transamerica would be obligated only after that
time. MEEMIC appealed, and the Court of Appeals
reversed, holding that Transamerica was obligated
to share in Perry's defense costs incurred before
MEEMIC paid its policy limit. Transamerica ap-
pealed.

II

To determine how defense costs should be allo-
cated, it is first necessary to determine the nature
of each insurer's duty to defend its insured in the
circumstances at issue. It is not disputed that
Continental and MEEMIC, as insurers of the vehi-
cles involved in single vehicle accidents, are the
primary insurers in these cases.[3] Nor do these
cases involve "true" excess insurers.[4] "True" ex-
cess insurance is analogous to umbrella insurance

[3] *Turner v Auto Club Ins Ass'n,* 448 Mich 22, 34; 528 NW2d 681
(1995).

[4] "True" excess coverage occurs where a single insured has two
policies covering the same loss, but one policy is written with the
expectation that "the primary will conduct all of the investigation,
negotiation and defense of claims until its limits are exhausted . . . ."
7C Appleman, Insurance Law & Practice, § 4682, p 28. See also
*Hartford Accident & Indemnity Co v Continental Nat'l American Ins*

in that a single insured by specific design layers coverage.[5] The logical rule that we adopt in "true" excess insurance cases is that the "true" excess insurer is liable for defense costs only after the primary insurer is excused under the terms of its policy.[6]

In both cases before us, the additional insurers are not "true" excess insurers; rather, their duty to defend and thus their responsibility for defense costs is triggered by their insureds' coincidental involvement in the underlying accidents. The issue we must resolve is the allocation of defense costs between these additional insurers where there is a clearly designated primary insurer.

In *Frankenmuth,* Continental argues that Frankenmuth is a primary coinsurer and thus should be liable pro rata for the costs of the defense before Continental paid its policy limit. Likewise in MEEMIC, MEEMIC argues that Transamerica should be liable on a pro-rata basis for the costs of the defense. Continental and MEEMIC cite *Celina Mut Ins Co v Citizens Ins Co of America,* 133 Mich App 655; 349 NW2d 547 (1984), for the proposition that when it is clear that a settlement will exceed the limits of the primary insurer's policy, the "excess" insurer should be forced to

_____

*Co,* 861 F2d 1184, 1187 (CA 9, 1989). Further, the rates of a "true" excess insurer are ascertained only after the excess insurer has given due consideration to the terms of the underlying primary policies. 46 CJS, Insurance, § 1138, p 542.

[5] *Texas Employers Ins Ass'n v Underwriting Members of Lloyds,* 836 F Supp 398, 407 (SD Tex, 1993). See also German & Gallagher, *Allocation of the duties of defense between carriers providing coverage to the same insured,* 47 Ins Counsel J 224-261 (1980).

[6] Although there is no contractual relationship between a primary and a "true" excess insurer, it is commonly understood that the primary insurer owes the "true" excess insurer the same standard of care it owes to the insured. This duty has been grounded in both the doctrine of equitable subrogation and tort law. See Jerry, Understanding Insurance Law, pp 622-623.

participate in the costs of the defense from the beginning. We disagree.

One difficulty with the pro-rata approach is determining how the insurers' interests align so that defense costs can be fairly apportioned. In cases where it is clear that a primary insurer's policy limits will be exceeded, the primary's goal will likely be to avoid liability altogether, while the excess insurer's goal will be to reduce the plaintiff's damages. The resolution of this issue will no doubt generate additional litigation, contrary to the goal of Michigan's no-fault insurance system.[7] Further, requiring an excess insurer to participate pro rata on notice that the claim might exceed the primary insurer's limits effectively forces the excess insurer to be a coinsurer despite the language of its policy. Such a result is contrary to the excess insurer's reasonable expectations.[8] Finally, a pro-rata approach ignores the language of insurance policies that typically anticipate the involvement of other insurance.

### III

Once it is clear that the additional insurers are not "true" excess insurers, our inquiry must proceed to the terms and conditions of the policies involved. Where the status of the primary insurer is clear, as in these single car accident cases, the primary insurer is liable for the defense and its costs until its limit is paid. Additional insurers who by the terms of their policies also cover some loss arising from the single car accident are coincidental excess insurers. The duty of these coinci-

[7] See, e.g., *Shavers v Attorney General,* 402 Mich 554, 578-579; 267 NW2d 72 (1978).

[8] See 46 CJS, Insurance, § 1152, pp 569-570. See also *Signal Cos v Harbor Ins Co,* 27 Cal 3d 359, 370-371; 165 Cal Rptr 799; 612 P2d 889 (1980).

dental excess insurers may vary depending on the terms of their policies.

In circumstances not presented today, it may be difficult to clearly designate a primary insurer. In such circumstances, the next inquiry should be whether the terms of the policies at issue cover the same loss, the same risk, and the same subject matter. If there is exactly concurring coverage, it might be appropriate to prorate the costs of defense. However, where there is a policy more specifically tailored to the circumstances of the claim, it would be appropriate to designate that policy as the primary insurer and for that insurer to defend to the limits of its policy and be responsible for the accompanying defense costs.

This Court has held that where there are competing other insurance clauses, we will endeavor to reconcile them.[9] Similarly, where there are disputes regarding the potentially conflicting duties to defend and to bear defense costs between multiple insurers for multiple insureds, we hold that the policies at issue should be honored to the greatest extent possible.

In *Frankenmuth,* Cook's truck appears to be a "temporary substitute automobile" as defined in the Frankenmuth policy.[10] Therefore, under the

---

[9] *St Paul Ins Co v American Home Assurance Co,* n 1 *supra* at 562.

[10] The Frankenmuth policy carried by Flint Tent and Awning states:

"[T]emporary substitute automobile" means any automobile, truck or trailer, not owned by the named Insured [Flint Tent and Awning], while temporarily used with the permission of the owner [Cook] as a substitute for the owned automobile . . . .

* * *

If the Insured [Flint Tent and Awning] has other insurance against a loss . . . the Company shall not be liable under this policy for a greater proportion of such loss than the applicable limit of liability, stated in the Declarations bears to the total

"other insurance" clause of the Frankenmuth policy, Frankenmuth is an excess insurer under the facts of this case. Given this policy language, we hold that Frankenmuth's duty to defend is analogous to a "true" excess insurer and, therefore, Frankenmuth should not be liable for defense costs until Continental is excused under the terms of its policy.

In *MEEMIC*, Perry bought the insurance policy from Transamerica with terms to cover the situation in which a family member is involved in an accident while driving a nonowned automobile.[11] The Transamerica policy makes clear that when the "Other Automobile" provision of its policy was triggered, Transamerica would be the excess insurer. Therefore, it is again appropriate to apply the rule for "true" excess insurers. The proper outcome in *MEEMIC* is for MEEMIC to have defended and paid the defense costs until it paid its limit. Thus, Transamerica is liable for the defense and costs incurred only after MEEMIC is excused under the terms of its policy.

IV

A single rule applied pro forma cannot address the multiple variations of policies that we may

applicable limit of liability of all valid and collectible insurance against such loss; provided, however, the insurance *with respect to temporary substitute automobile or non-owned automobile shall be excess insurance over any other valid and collectible insurance.* [Emphasis added.]

[11] The Transamerica policy at v(a) defines other automobiles as those used by "residents of the same household [Perry's son] as the Named Insured [Perry]" with permission of the owner. The policy then states:

[T]he insurance with respect to . . . other automobiles under (a) of Insuring Agreement v or under part (a) of Insuring Agreement vi shall be excess insurance over any other valid and collectible insurance.

face. On the facts of these cases, we affirm *Frankenmuth,* but reverse MEEMIC and reinstate the circuit court decision.

BRICKLEY, C.J., and BOYLE and RILEY, JJ., concurred with WEAVER, J.

CAVANAGH, J. (*concurring in part and dissenting in part*). I agree with Justice LEVIN that defense costs should be borne by the primary and "excess" insurers pro rata on the basis of their shares of the underlying liability. I, therefore, agree that the decision of the Court of Appeals in MEEMIC v *Chalfant* should be reversed. I also agree that the same principle would apply in *Frankenmuth Mut v Continental* if Continental had acted equitably. However, because Continental wrongly refused to provide a defense to its insured, I would not allow Continental to profit now.

As Justice LEVIN recognizes, Michigan law permits contribution between insurers on the theory of equitable subrogation. Equitable subrogation must be employed because the insurers have no contract between themselves; their obligations run to their insureds, not each other. Thus, equitable subrogation may be employed to compensate an insurer for costs it incurs in defending an insured when another insurer is also contractually required to provide the defense.

Nevertheless, it is a well-established equitable maxim that those who seek equity must do so with "clean hands." *Stachnik v Winkel,* 394 Mich 375, 382; 230 NW2d 529 (1975). Any wilful act that transgresses equitable standards of conduct is sufficient to allow a court, on its own motion, to deny a party equitable relief. *Id.* at 386.

Accordingly, I would affirm the decision of the Court of Appeals in *Frankenmuth.* A primary

insurer who wrongly fails to provide a defense may not use equitable subrogation to force the excess insurer, who provided the entire defense in the first place, to pay a pro-rata share of the defense costs. Continental should bear the costs of the underlying action because equity should provide relief only to those with clean hands.

LEVIN, J. (*dissenting*). The questions presented in these cases consolidated on appeal concern the allocation between "primary" insurers of the cost of defending an insured where the operation of "other insurance" clauses renders one insurance policy excess coverage and the other primary coverage, and the liability exceeds the primary policy coverage limits so that both insurers must pay.[1]

The facts of these cases represent two sides of a single coin. In *Frankenmuth Mut Ins Co, Inc v Continental Ins Co,* the primary insurer, Continental, wrongly refused to provide a defense for an insured. An excess insurer, Frankenmuth, undertook the defense and now seeks contribution from the primary insurer for the costs incurred by it in defending the lawsuit during the period when the primary insurer owed a defense.

In *Michigan Educational Employees Mut Ins Co v Chalfant,* the primary insurer, MEEMIC, provided a defense. It seeks contribution from the excess insurer, Transamerica Insurance Corporation of America, for part of its defense costs.

We conclude in both cases that the defense costs should be borne by the primary and excess insur-

[1] In *St Paul Fire & Marine Ins Co v American Home Assurance Co,* 444 Mich 560; 514 NW2d 113 (1994), this Court ruled that multiple conflicting "other insurance" clauses would be reconciled. In that case, the insured's liability fell *within the limits* of the policy ruled to provide primary coverage. As a result, the primary insurer bore the entire cost of defense. *Id.,* p 563. These cases address the duties to defend of multiple insurers where the liability *exceeds the limit* of the primary policy.

ers pro rata, on the basis of their shares of the aggregate underlying liability as determined by settlement or adjudication. We would reverse the decisions of the Court of Appeals in both cases, and would remand the cases for proceedings consistent with this opinion.

I

In *Frankenmuth,* a bicyclist, Eric Bosco, was killed in a collision with a pick-up truck. The driver, Chris Bauermeister, was operating the vehicle for his employer, Flint Tent and Awning, Inc. The truck was owned by Kenneth Cook, then president of Flint Tent and Awning.

The personal representative of Bosco's estate commenced a wrongful death action. Appellant Continental insured Cook, the truck's owner. Appellee USAA Casualty Insurance Company insured Bauermeister, the driver of the truck. Appellee Frankenmuth was the insurer of Flint Tent and Awning.

The policies declared that primary coverage was provided if the accident involved a vehicle owned by the named insured, and excess coverage respecting a nonowned vehicle. Neither Frankenmuth nor Continental limited its duty to defend when the coverage was excess. The Continental policy provided that its duty to defend ended when "the applicable limit of the company's liability has been exhausted by payment of judgments or settlements."

The parties now agree that, as insurer of the truck's owner, Continental was the primary carrier for all defendants. Frankenmuth and USAA provided only excess coverage. Initially, Continental defended only the owner, and refused to defend

the driver or the company in the underlying litigation. Continental subsequently agreed to defend the driver, but not the company.[2]

Frankenmuth entered an appearance on behalf of both the driver and the company. Frankenmuth commenced this action, seeking a declaratory judgment that Continental also owed a defense to the company, and to recover costs Frankenmuth incurred defending the company and the driver.

In May, 1990, a year after the declaratory judgment was sought, Continental paid its $500,000 policy limits in partial settlement of the underlying litigation.[3] A jury returned a $1,045,000 verdict for Bosco's personal representative. After setting off Continental's partial settlement, no-fault benefits, and adding interest, the net amount was $613,569.

In the declaratory judgment action, the court ruled that Continental had been the primary insurer for all three defendants. The court ordered Continental to reimburse Frankenmuth for the $12,413 Frankenmuth expended defending the driver and the company before the partial settlement with Continental. In effect, this ruling made Continental solely responsible until it paid its policy limits for the cost of defending all three insureds.

Continental did not challenge the ruling that it was primary insurer for all defendants, and liable to indemnify them in the underlying action to its $500,000 policy limits. It appealed the allocation of defense costs. The Court of Appeals affirmed.[4]

[2] USAA did not provide a defense for any defendant.

[3] As part of the settlement, the plaintiff in the underlying litigation agreed to seek satisfaction of any judgment only from the remaining insurers, not the assets of any defendants.

[4] Unpublished opinion per curiam, entered September 14, 1993 (Docket No. 138157).

II

In *MEEMIC*, Trevor Chalfant was seriously injured when an automobile in which he was a passenger left the road. The car was driven by either defendant Michael Hinkle or defendant Jack Perry; each claims the other was driving. Hinkle's father, Charles Hinkle, owned the vehicle. Chalfant filed an action against Perry and both Hinkles. MEEMIC undertook the defense of all three defendants, hiring separate attorneys to defend the Hinkles and Perry. Transamerica also covered Perry under a policy with a $250,000 limit. The parties agree that MEEMIC provided primary coverage to all three defendants, Transamerica providing only excess.

Neither the MEEMIC nor the Transamerica policy limited the duty to defend when its coverage was excess.[5] MEEMIC's policy provided that it would not defend after its policy limits had been paid.

MEEMIC filed a declaratory judgment action, seeking a determination that it would be excused from the underlying lawsuit upon payment of its $100,000 policy limit to Chalfant. It also sought reimbursement from Transamerica for costs incurred defending Perry. The circuit court ruled that MEEMIC had an obligation to provide a defense to the defendants only until MEEMIC reached a settlement of the claims against the Hinkles. Thereafter, the court ruled, Transamerica would owe a duty to defend Perry. The court also denied MEEMIC's motion for reimbursement of its defense costs.

---

[5] Transamerica's argument that its policy did not create a duty to defend ignores the plain language of its policy. Part V makes coverages A and B, for which Transamerica has agreed to defend, applicable when the insured drives an unowned automobile with permission of its owner.

Meanwhile, the underlying dispute was settled by mediation. In accordance with the panel's $150,000 decision for Chalfant, MEEMIC paid $100,000 and Transamerica paid $50,000. The court's ruling that MEEMIC could be dismissed from the lawsuit upon paying its policy limits in partial settlement therefore became moot.

MEEMIC appealed the decision regarding defense costs, and the Court of Appeals reversed.[6] The Court of Appeals ruled that Transamerica had a duty to defend Perry, commencing when MEEMIC filed the declaratory judgment action. It ruled that Transamerica was liable for a pro-rata share of defense costs when both insurers had a duty to defend, namely, after the filing of the declaratory judgment action, and all defense costs after MEEMIC's duty ended upon payment of policy limits.

### III

Some courts hold that both the primary and excess insurers have a duty to defend the insured that is personal to each. These courts preclude allocation of defense costs by contribution in the absence of a contractual agreement between the insurers.[7] This approach has been criticized, because it

> would simply provide a premium or offer a possible windfall for the insurer who refuses to defend, and thus, by leaving the insured to his own resources, enjoys a chance that the costs of defense will be provided by some other insurer at no

---

[6] 204 Mich App 440; 516 NW2d 93 (1994).

[7] See, e.g., *Nordby v Atlantic Mut Ins Co,* 329 NW2d 820, 824 (Minn, 1983); *Maryland Casualty Co v American Family Ins Group,* 199 Kan 373, 385-386; 429 P2d 931 (1967).

expense to the company which declines to carry out its contractual commitments.[8]

Michigan permits contribution between insurers on a theory of equitable subrogation. *Commercial Union Ins Co v Medical Protective Co,* 426 Mich 109, 119; 393 NW2d 479 (1986). Equitable subrogation is a legal fiction through which a person who pays a debt for which another is primarily responsible is substituted or subrogated to all the rights and remedies of the other." *Id.,* p 117.

Where there is only one insurer, an insured constrained to undertake his own defense can recover those costs from the insurer.[9] Where there is more than one insurer, the doctrine of equitable subrogation allows an insurer who has provided a defense to "stand[ ] in the shoes" of the insured,[10] and recover from the insurer who wrongly failed to defend.

IV

Courts that allow contribution between insurers have done so in a number of different ways, depending on the facts of the cases. Woven through these factual variations are two somewhat conflicting analytic approaches.

Some courts require the primary insurer to bear the entire cost of defending the insured, even

---

[8] *Continental Casualty Co v Zurich Ins Co,* 57 Cal 2d 27, 37; 17 Cal Rptr 12; 366 P2d 455 (1961). See also 7C Appleman, Insurance Law & Practice, § 4682, p 33 ("[i]f the recovery of costs remains uncertain it is an open invitation to abandon the insured to his own devices—hardly what he had bargained for when he paid his premiums"); Keeton & Widiss, Insurance Law, § 9.1, p 994.

[9] *Continental Casualty,* n 8 *supra.*

[10] *Commercial Union, supra,* p 118.

when the liability exceeds the primary coverage.[11]
These courts ignore that the excess insurer also
has assumed a duty to defend the insured.[12]

The duty to defend is broader than and indepen-
dent of the duty to pay for covered liabilities.[13] The
duty to defend is triggered whenever the facts set
forth in the pleadings would require coverage,[14] or
an "unpleaded fact or set of facts [known by the
insurer to be true] would bring the claim within
the coverage of the policy."[15]

Some courts have reasoned that the excess in-
surer's duty to defend is not extinguished merely
because another insurer is providing a defense.[16]
Appleman has criticized this latter group of cases
because "[i]t cannot, even remotely, be suggested
that the quality of the defense being given to the

---

[11] See, e.g., *Hobbs v Fireman's Fund American Ins Cos,* 339 So 2d
28, 39 (La App, 1976) (the primary insurer was liable for all attorney
fees, although there was an excess insurer with a duty to defend);
*American Surety Co of New York v Canal Ins Co,* 258 F2d 934, 937
(CA 4, 1958) (the nondefending primary insurer was liable to the
excess insurer for the entire cost of tendering a defense).

[12] This observation does not apply to "true" excess policies—i.e.,
umbrella policies—where the insurer has not contracted to provide
any defense for the insured. *Guaranty Nat'l Ins Co v American
Motorists Ins Co,* 981 F2d 1108, 1109 (CA 9, 1992) (noting that a true
excess policy "is issued in anticipation of the existence of the under-
lying [primary] policy and is priced in the belief that the excess
carrier will not have to provide a defense").

[13] *Guerdon Industries v Fidelity & Casualty Co of New York,* 371
Mich 12, 18; 123 NW2d 143 (1963).

[14] *Id.*

[15] *Kangas v Aetna Casualty & Surety Co,* 64 Mich App 1, 5; 235
NW2d 42 (1975).

[16] See, e.g., *Guaranty Nat'l Ins Co v American Motorists Ins Co,* 758
F Supp 1394, 1397 (D Mont, 1991), aff'd .981 F2d 1109 (CA 9, 1992)
(see n 12). See also *St Paul Mercury Ins Co v Huitt,* 336 F2d 37, 44
(CA 6, 1964) (stating that the insured may call on both insurers to
tender a defense, but not addressing the issue of contribution between
insurers); *Universal Underwriters Ins Co v Wagner,* 367 F2d 866, 877,
n 22 (CA 8, 1966) (noting in dicta that both insurers appeared to have
a duty to defend).

insured will be improved somehow simply because
it is shared with another carrier."[17]

Expecting the excess carrier to join the primary
carrier in defending as soon as the excess carrier's
duty to defend arises is often unrealistic. The duty
to defend arises when the facts set forth in the
pleadings, or unpleaded facts known to the in-
surer, would subject the insurer to liability.[18] But
in the ordinary case, where a complaint seeks
damages in excess of plaintiff's expected recovery,
an excess carrier should not be expected to enter a
lawsuit in which its coverage is unlikely to be
implicated.

It would be even more problematic to require an
excess insurer to take part on the basis of un-
pleaded facts known to it. Insurers would become
entangled in disputes concerning when the excess
insurer knew or should have known that its cover-
age would be required.

In both these scenarios, seeking to determine
when the excess insurer should or must become
involved does nothing to further the prompt, effec-
tive defense of the insured. The primary carrier
should already be providing a defense.

We distinguish, however, between requiring an
excess insurer to tender a defense, and requiring it
to defray the costs of another insurer who has
done so. The insurer providing the defense is not
entitled to "stand[ ] in the shoes" of the insured
until it has fully discharged its own duty to pro-
vide a defense for the insured.[19] It, therefore, may
not require the nondefending insurer to actually

---

[17] Appleman, n 8 *supra*, § 4682.

[18] See ns 13-14.

[19] *Commercial Union, supra,* p 118 quoting *Commercial Union
Assurance Cos v Safeway Stores,* 26 Cal 3d 912, 917-918; 164 Cal Rptr
709; 610 P2d 1038 (1980) (explaining that the theoretical basis of
equitable subrogation is that the excess insurer has *discharged the
insured's* liability in the underlying litigation).

join in conducting the defense.[20] As one court
observed,

> Whatever may be the right ultimately to saddle
> off a part of the cost of defense actually under-
> taken once payment has been made and a right
> comparable to subrogation is being asserted, it is
> contrary to the very nature of the contract that
> the insurer can scout around in the hopes that it
> can find someone whose defense the assured is
> compelled to accept.[21]

But once an insurer has completed its defense, it
is equitably subrogated to the rights of the insured
and ought to be able to recover costs from the
insurer who has avoided its duty to defend.

Thus, in applying equitable subrogation, we be-
gin with the premise that both insurers owe an
overlapping duty to defend the insured. While one
insurer may not require the other to join in de-
fense with it or in its place, an insurer who has
provided a defense may seek contribution from the
nondefending insurer. This approach, in the words
of the Court of Appeals, "provides no obstacle to

[20] Where the liability is expected to fall near the limit of the
primary coverage, the incentives of the primary insurer and the
excess insurer may conflict. No matter how large the settlement with
the plaintiff in the underlying lawsuit, the primary insurer is only
liable to its policy limits. The defending primary insurer therefore
has an incentive to reduce its litigation costs—and thus total costs—
by reaching a generous settlement with the plaintiff in the underlying
lawsuit.

This problem, however, is minimized by two factors. First, the
excess insurer in such situations has an incentive to follow the
settlement negotiations closely to protect its own interests. Second,
the primary carrier has a duty to exercise good faith to settle within
its policy limits. *Commercial Union, supra,* p 119. In applying this
duty, the reasonableness of the defending primary insurer's conduct is
judged without considering the costs of defense. Syverud, *The duty to
settle,* 76 Va L R 1113, 1141 (1990). It therefore may not use the
minimization of its own defense costs to justify agreeing to a larger
settlement.

[21] *American Fidelity & Casualty Co v Pennsylvania Threshermen &
Farmers' Mut Casualty Ins Co,* 280 F2d 453, 459-460 (CA 5, 1960).

.

an effective defense [of the insured] and leads to a more equitable distribution of the cost of litigation among the insurers."[22]

V

Whatever analytic framework courts espouse, they apply contribution differently, depending on the facts of the case. As a United States district court observed, "it must be emphasized that the holding in any particular case addressing the issue of allocation of defense costs between primary and excess insurers must be considered in light of the particular facts of each case and the various policies involved."[23]

A

Where, as in MEEMIC, the primary insurer provides a defense and the excess coverage is also reached, courts generally have allocated defense costs on a pro-rata basis, according to each insurer's share of the underlying liability.[24]
The Court of Appeals applied this approach in

---

[22] Celina Mut Ins Co v Citizens Ins Co of America, 133 Mich App 655, 661; 349 NW2d 547 (1984).

[23] Guaranty Nat'l Ins (district court), n 16 supra at 1396. Similarly, in Signal Cos v Harbor Ins Co, the California Supreme Court stated:

We expressly decline to formulate a definitive rule applicable in every case in light of varying equitable considerations which may arise, and which affect the insured and the primary and excess carriers, and which depend upon the particular policies of insurance, the nature of the claim made, and the relation of the insured to the insurers. [27 Cal 3d 359, 369; 165 Cal Rptr 799; 612 P2d 889 (1980).]

[24] Celina, n 22 supra, p 663; Guaranty Nat'l Ins (district court), n 16 supra, p 1398; American Fidelity, n 21 supra; Nabisco Inc v Transport Indemnity Co, 143 Cal App 3d 831; 192 Cal Rptr 207 (1983); 14 Couch, Insurance, 2d (rev ed), § 51:36, pp 446-447. But see, Hobbs, n 11 supra. Courts refusing to accept equitable subrogation at all, of course, do not permit contribution in these cases. See, e.g., Nordby, n 7 supra.

*Celina Mut Ins Co v Citizens Ins Co of America,*
133 Mich App 655; 349 NW2d 547 (1984).[25] Where,
however, the liability falls entirely within the
policy limits of the primary coverage, courts have
consistently required the primary insurer to bear
the entire cost of defense.[26]

B

Where, as in *Frankenmuth,* the excess insurer
undertakes the defense, courts have taken two
approaches to requiring contribution when the
extent of liability involves both primary and ex-
cess insurers. Some courts require the primary
insurer to bear the entire cost of defending the
insured.[27] Courts taking this approach generally

[25] *Celina* claimed to be applying the "minority rule." Our examina-
tion of case law leads us to doubt the usefulness of the term "major-
ity" or "minority." The facts of the cases cited as examples of such
"rules" vary wildly. See, e.g., Ostrager & Newman, Handbook on
Insurance Coverage Disputes, § 11.05[c] (mentioning the "traditional
rule" that an excess insurer is not required to contribute to the
insured's defense when the primary insurer is required to defend, but
adding a lengthy list of cases that "suggest that in certain circum-
stances" an excess carrier is required to do so); anno: *Allocation of
defense costs between primary and excess insurance carriers,* 19
ALR4th 107-135 (dividing case law according to facts).

[26] *St Paul Fire & Marine,* n 1 *supra,* p 563; *P L Kanter Agency, Inc
v Continental Casualty Co,* 541 F2d 519, 523 (CA 6, 1976) (applying
Michigan law); *American Fidelity Ins Co v Employers Mut Casualty
Co,* 3 Kan App 2d 245, 255-256; 593 P2d 14 (1979) (stating that the
primary carrier is solely responsible for the defense where the claim
falls within the limits of the primary policy, but that both insurers
are liable for a pro-rata share of the cost of defending a claim
exceeding the limit of the primary policy).

MEEMIC argues that *St Paul* supports its position. We disagree. The
passage from *St Paul* simply stated that an excess insurer would not
be liable for defense costs or indemnification where the underlying
liability did not exceed the primary coverage. It did not suggest how
the defense costs might be allocated when both coverages were
reached.

[27] See, e.g., *American Surety Co of New York v Canal Ins Co,* n 11
*supra; Republic Mut Ins Co v State Farm Mut Automobile Ins Co,* 413
F Supp 649, 654 (SD W Va, 1976); *State Farm Mut Automobile Ins Co
v Foundation Reserve Ins Co,* 78 NM 359; 431 P2d 737 (1967) (affirm-
ing the trial court judgment of full costs for the excess insurer); *Aetna
Casualty & Surety Co v Coronet Ins Co,* 44 Ill App 3d 744, 750-751;

reach this conclusion without discussion. They seem to assume that by standing in the insured's shoes through equitable subrogation, the excess insurer is entitled to recover the full defense costs that the insured could recover.[28]

This approach ignores that the excess insurer has also assumed a duty to defend the insured. Many courts have recognized the shared duty, and have allocated defense costs to both insurers, where the liability was large enough to implicate both primary and excess coverage. They generally have done so on a pro-rata basis according to the parties' respective shares of the underlying liability.[29]

The issue in *Frankenmuth* is further complicated because, after first refusing to provide a defense, Continental eventually took over the driver's defense from Frankenmuth. By paying its policy limits to settle, Continental concluded its duty to defend.[30] Frankenmuth's defense costs thereafter were incurred when only it owed a duty to defend. Some courts in that situation have nevertheless allocated defense costs according to the total liability, without regard to whether the costs were incurred before or after the partial settlement;[31] and we agree that is the correct approach. There is authority to the contrary, how-

358 NE2d 914 (1976); *Fidelity & Casualty Co of New York v Secured Casualty Co,* 87 Ohio Law Abs 459; 180 NE2d 297, 301-302 (1961).

[28] *Fidelity & Casualty Co of NY,* n 27 supra.

[29] *Continental Casualty,* n 8 supra, pp 37-38; *Hartford Accident & Indemnity Co v Civil Service Emp Ins Co,* 33 Cal App 3d 26; 108 Cal Rptr 737 (1973); *American Fidelity Ins Co,* n 26 supra. A few courts have also decided arbitrarily to split the defense costs in half. See, e.g., *Central Nat'l Ins Co v LeMars Mut Ins Co of Iowa,* 294 F Supp 1396, 1402 (SD Iowa, 1968); *Viani v Aetna Ins Co,* 95 Idaho 22; 501 P2d 706 (1972), overruled on other grounds *Sloviaczek v Estate of Puckett,* 98 Idaho 371; 565 P2d 564 (1977).

[30] According to the terms of its policy.

[31] *Aetna Casualty & Surety Co v Certain Underwriters,* 56 Cal App 3d 791, 803-805; 129 Cal Rptr 47 (1976).

ever, where courts have allocated all defense costs to the primary insurer until its duty to defend is concluded through payment, and have saddled the excess insurer with the full defense costs incurred thereafter.[32]

We would adopt the former approach for the reasons set forth in part VI. We would hold that even where the primary insurer has paid its policy limits in partial settlement of a claim, contribution between primary and excess insurers should turn on their respective shares of the final liability.[33]

## VI

In each of the instant cases, the excess insurer accepts responsibility for all defense costs after the primary insurer has paid its limits in partial settlement of the underlying claim. They seek to avoid bearing part of the defense costs for the period during which the primary insurer was also responsible for defense.

But in both cases both insurers owed a duty to defend the insured. Allocating defense costs on the basis of the shares of the final underlying liability encourages primary insurers to continue providing a defense even when it becomes clear that their policy limits will, or are likely to, be exceeded. A temporal rule would encourage a primary insurer to pay and leave prematurely, which might disrupt

[32] *Santa Clara Co v United States Fidelity & Guaranty Co,* 859 F Supp 396, 400 (ND Cal, 1994), vacated on reconsideration on other grounds 868 F Supp 274 (ND Cal, 1994).

[33] In some cases, this approach may result in a primary insurer paying for defense costs incurred after its contractual duty to defend ended by payment of its policy limits. It is important to remember, however, that the allocation of defense costs is not governed by contract, but by " 'equitable principles designed to accomplish ultimate justice in the bearing of a specific burden.' " *Signal Cos,* n 23 *supra,* p 369, quoting *American Auto Ins Co v Seaboard Surety Co,* 155 Cal App 2d 192, 195-196; 318 P2d 84 (1957).

the defense. of the insured,[34] possibly engendering additional litigation between the insurers and, in some cases, the insured.

We emphasize that this decision to prorate according to total liability only would include defense costs where the insurers' respective interests closely align so that they would pursue compatible strategies on behalf of the insured.[35] This decision would not extend to "true" excess policies, where the duty to defend is limited.[36]

### VII

In *Frankenmuth,* the record is insufficient to determine the total defense costs incurred by Frankenmuth and Continental. Similarly in MEEMIC, it is not clear how much MEEMIC expended in defense. In both cases, the Court of Appeals took a different approach than we would adopt. We would reverse and remand both cases to the circuit court for proceedings consistent with this opinion.

On remand, the circuit courts should determine the total sum spent by both insurers on the costs of defense. This figure should be allocated to each insurer according to its portion of the underlying liability.

### VIII

The majority, although acknowledging that Frankenmuth and Transamerica are not "true"

---

[34] Appleman, n 8 *supra,* p 32.

[35] Keeton & Widiss, n 8 *supra,* p 995. Cf. *Republic Mut,* n 27 *supra,* p 654 (permitting contribution of an excess insurer's defense costs, but denying compensation for investigation expenses because the excess insurer would have investigated the accident without regard to whether the primary insurer provided a defense).

[36] *Guaranty Nat'l Ins Co,* n 12 *supra.*

excess insurers, adopts for the instant cases the same rule that the majority opines, in dicta, would be applicable to true excess insurers: The excess insurer "is liable for defense costs only after the primary insurer is excused under the terms of its policy."[37]

The majority rejects the pro-rata approach that we would adopt on the basis that adoption of that approach would require a determination at some time during the course of litigation of when it becomes clear that a settlement or adjudication will exceed the limits of the primary insurer's policy. The majority argues that the pro-rata approach would become a source of "additional litigation, contrary to the goal of Michigan's no-fault insurance system."[38]

The majority's argument reveals a misunderstanding of the pro-rata approach. We propose a determination, after the conclusion of the underlying litigation, allocating all the costs that have already been incurred—not a determination during the course of litigation of the often murky question when something that is inherently unclear became or becomes "clear."

We do not propose that an excess insurer be required at any time to enter into and participate in providing an ongoing defense at the same time as the primary insurer is providing a defense. Confusion and redundant expense might result from requiring, as distinguished from permitting, an excess insurer to enter into the fray. Allocating costs after the conclusion of the litigation on the basis of the insurers' shares of the aggregate un-

---

[37] *Ante,* p 436.

[38] *Ante,* p 437. While both the instant cases involve automobile insurance policies, the principles involved are not limited to automobile policies. The very same issues can arise in other insurance contexts. The "goal of Michigan's no-fault insurance system" is a makeweight.

derlying liability, as ultimately determined by settlement or adjudication, avoids any need to determine before settlement or adjudication whether the excess insurer will in fact become obligated to pay because the settlement or adjudication exceeded the primary insurer's policy limit.

The majority also argues that the approach we advocate "forces the excess insurer to be a coinsurer despite the language of its policy. Such a result is contrary to the excess insurer's reasonable expectations."[39] The "language of the policy" is not spelled out in the majority opinion. If the reference is to provisions stating that under certain circumstances the insurer's coverage is excess, the argument ignores that the obligation to defend and the obligation to provide coverage are separate and distinct.[40]

It is again relevant that the approach we advocate is, in most situations, in accord with the weight of authority.[41]

We would reverse and remand to the circuit court in both cases for proceedings consistent with this opinion.

---

MALLETT, J., concurred with LEVIN, J.

[39] *Ante,* p 437 and n 8. The majority cites Corpus Juris Secundum and a decision of the California Supreme Court involving a true excess insurer.

*Allstate Ins Co v Keillor (After Remand),* 450 Mich 412; 537 NW2d 589 (1995), is another case decided today involving the reasonable expectations doctrine.

[40] In MEEMIC, the majority requires the primary insurer to pay the entire cost of defense with the result that Transamerica, which also had a contractual obligation to provide a defense, contributes nothing to the cost of defense even though Transamerica paid one-third, $50,000, of the mediation settlement.

[41] See n 24 and accompanying text.